**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Southern Division)

| | |
|---|---|
| JOSEPH INNES, *et al.*,     ) | |
|     ) | |
|     Plaintiffs,     ) | |
|     ) | |
|     v.     ) | Case No. 13-cv-02800-DKC |
|     ) | |
| THE BOARD OF REGENTS OF THE     ) | |
| UNIVERSITY SYSTEM OF MARYLAND,     ) | |
| *et al.*,     ) | |
|     ) | |
|     Defendants.     ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Joseph B. Espo, Fed. Bar No. 07490
Brooke E. Lierman, Fed. Bar No. 17879
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland  21202
T:  (410) 962-1030
F:  (410) 385-0869
jbe@browngold.com
blierman@browngold.com

Caroline Jackson, Fed. Bar No. 18545
THE NATIONAL ASSOCIATION OF
THE DEAF LAW AND ADVOCACY
CENTER
8630 Fenton St., Suite 820
Silver Spring, Maryland  20910
T:  (301) 587-1788
F:  (301) 587-1791
caroline.jackson@nad.org

*Attorneys for Plaintiffs*

Dated:  June 10, 2014

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ................................................................................................... 1

UNDISPUTED FACTS ........................................................................................... 1

    I.    Plaintiffs Are Avid Terrapins Fans Who Require Auxiliary Aids And Services For
        Effective Communication ............................................................................. 1

    II.   Defendants Are Public Entities And Recipients Of Federal Financial Assistance ............. 3

    III.  Defendants Host Football And Basketball Games ............................................... 3

    IV.  Defendants Do Not Provide For Plaintiffs' Effective Communication At University
        Football Or Basketball Games, Despite Multiple Requests Made Over More Than
        A Decade ............................................................................................... 5

        A.   Plaintiffs Repeatedly Requested Line-Of-Sight Captioning For More Than
             A Decade ........................................................................................ 6

        B.   Defendants Finally Responded To Plaintiffs' Captioning Requests With An
             Ineffective System Plaintiffs Had Urged Them Not To Implement ................ 9

    V.   Defendants Do Not Provide Effective Communication To Deaf Or Hard-Of-Hearing
        Terrapins Fans On Their Athletics Website, www.UMTerps.com ................... 14

LEGAL STANDARD ............................................................................................ 15

ARGUMENT ..................................................................................................... 16

    I.    Defendants Have Violated Title II And Section 504 By Failing To Ensure
        Effective Communication ........................................................................... 16

        A.   Title II And Section 504 Require Defendants To Ensure Effective
             Communication With Plaintiffs And Give Primary Consideration
             To Their Requested Auxiliary Aids And Services ................................... 17

             1.   Title II And Section 504 Require Defendants To Ensure Effective
                 Communication With Plaintiffs ................................................. 20

             2.   Title II Requires Defendants To Give Primary Consideration To Plaintiffs'
                 Requested Auxiliary Aids And Services ...................................... 21

B.    Defendants Discriminated Against Plaintiffs Based On Their Disability By
      Failing To Provide Effective Communication During Football And Basketball
      Games. ...................................................................................................................22

C.    Defendants Have Demonstrated Deliberate Indifference To Plaintiffs' Need
      for Auxiliary Aids And Services. ..........................................................................23

D.    Defendants Are Also Discriminating Against Plaintiffs Based On Their
      Disability By Failing To Caption Aural Content Streamed On The Website
      www.UMTerps.com. ..............................................................................................24

II.   Plaintiffs Are Entitled To Injunctive And Declaratory Relief ...........................................26

CONCLUSION .........................................................................................................................26

REQUEST FOR HEARING .....................................................................................................26

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*A Helping Hand, LLC v. Baltimore* C'nty,
515 F.3d 356 (4th Cir. 2008) ...................................................................18

*Adams v. Montgomery College (Rockville)*,
834 F.Supp.2d 386 (D. Md. 2011) .......................................................23, 26

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................16

*Chisolm v. McManimon*,
275 F.3d 315 (3d Cir. 2001) ......................................................................18

*Constantine v. Rectors & Visitors of George Mason Univ.*,
411 F.3d 474 (4th Cir. 2005) ...............................................................18, 19

*Deans v. CSX Transp., Inc.*,
152 F.3d 326 (4th Cir. 1998) .....................................................................16

*Duvall v. C'nty of Kitsap*,
260 F. 3d 1124 (9th Cir. 2001) ..................................................................20

*Equal Rights Ctr. v. Niles Bolton Assocs.*,
602 F.3d 597 (4th Cir. 2010) ) ..................................................................17

*Feldman v. Pro Football, Inc.*,
579 F. Supp. 2d 697 (D. Md. 2008) ................................................16, 22, 26

*Feldman v. Pro Football, Inc.*,
419 Fed. App'x 381 (4th Cir. 2011) ...........................................16, 20, 21

*Glynn v. EDO Corp.*,
710 F.3d 209 (4th Cir. 2013) .....................................................................16

*Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*,
64 F.3d 962 (4th Cir. 1995) .......................................................................16

*Independent Living Resources v. Oregon Arena Corp.*,
982 F. Supp. 698 (D. Or. 1997) .............................................................16-17

*Innovative Health Sys. v. City of White Plains,*
  117 F.3d 37 (2d Cir. 1997) ..................................................................19

*K.M. ex rel. Bright v. Tustin Unified Sch. Dist.,*
  725 F. 3d 1088 (9th Cir. 2013) .................................................18, 20, 23

*Oconomowoc Residential Programs, Inc. v. City of Milwaukee,*
  300 F.3d 775 (7th Cir. 2002) .............................................................17

*Pashby v. Delia,*
  709 F.3d 307 (4th Cir. 2013) .............................................................18

*Pathways Psychosocial v. Town of Leonardtown, Md.,*
  223 F. Supp. 2d 699 (D. Md. 2002) ....................................................26

*Paulone v. City of Frederick,*
  787 F. Supp. 2d 360 (D. Md. 2011) ...........................................18, 19, 23

*Proctor v. Prince George's Hosp. Ctr.,*
  32 F. Supp. 2d 820 (D. Md. 1998) ..............................................19, 23, 24

*Seremeth v. Bd. of C'nty Com'rs Frederick C'nty,*
  673 F. 3d 333 (4th Cir. 2012) .....................................19, 20, 21, 25

*U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
  467 U.S. 837 (1984) ..................................................................18

## Statutes

29 U.S.C. § 794 ......................................................17, 19, 24, 25
42 U.S.C. § 12101(b) ...............................................................17
42 U.S.C. § 12131 ........................................................1, 17, 19
42 U.S.C. § 12132 ...............................................................18
42 U.S.C. § 12133 ...............................................................18
42 U.S.C. § 12134 ...............................................................18

## Regulations

28 C.F.R. Pt. 35 ...............................................................19
28 C.F.R. Pt. 39 ...............................................................18
28 C.F.R. § 35.104 .............................................................20

28 C.F.R. § 35.160 ................................................................................17, 20, 21, 22

28 C.F.R. § 36.303 .........................................................................................17

35 C.F.R. § 35.102 .........................................................................................25

**Rules**

Fed. R. Civ. P. 30(b)(6).............................................................................4, 6, 15

Fed. R. Civ. P. 56(a) .........................................................................................16

**Other Authorities**

H.R.Rep. No. 101-485(II), 101st Cong., 2d Sess. 84 (1990), 1990 U.S.C.C.A.N. 303 ) .............19

## INTRODUCTION

Plaintiffs Joseph Innes, Sean Markel, and Daniel Rinas, three deaf individuals who have been attending football games and men's and women's basketball games at the University of Maryland, College Park (the "University") for decades, filed suit to require the Defendants to rectify their long-standing refusal to provide for effective communication at these games and on the University's athletics website, as well as for damages. Defendants' refusal violates Title II of the Americans with Disabilities Act of 1990 ("Title II"), 42 U.S.C. §§ 12131 et seq., and Section 504 of the Rehabilitation Act of 1973 ("Section 504").

In the twenty-four years since a bipartisan Congress passed Title II, Defendants have spent more than $200 million building, renovating, and upgrading the facilities that host these games.[1] Yet they have refused to honor Plaintiffs' repeated requests for line-of-sight captioning during football and basketball games. And they have refused to provide captioning for the aural information streamed on Defendants' athletics website, despite a clear federal mandate. For the reasons that follow, Plaintiffs are entitled to summary judgment as to liability on all claims, as well as injunctive and declaratory relief and a trial to determine damages.

## UNDISPUTED FACTS

### I.    Plaintiffs Are Avid Terrapins Fans Who Require Auxiliary Aids And Services For Effective Communication

Plaintiffs Joseph Innes, Sean Markel, and Daniel Rinas are each deaf and substantially limited in the major life activities of hearing and speaking.[2]  They rely on auxiliary aids and

---

[1] Defendants' Answers to Plaintiffs' Interrogatories, Ex. 1, at Answer 23.
[2] Plaintiff Joseph Innes's Answers to Interrogatories., Ex. 2, at Answer 2; Plaintiff Sean Markel's Answers to Interrogatories, Ex. 3, at Answer 2; Plaintiff Daniel Rinas's Answers to Interrogatories., Ex. 4, at Answer 2.

services, such as real-time captioning and American Sign Language interpreters, to receive aural information in public settings.[3]

Innes holds ten season tickets to the University's football games and several season tickets to the University's basketball games.[4]  He has been attending these games for decades and will continue attending them.[5]  In addition to holding season tickets, Innes is a significant donor to the University.[6]

Rinas is "strong fan" of Terrapins basketball.[7]  He attends Terrapins football games[8] and has attended nearly every men's home basketball game in the past three years.[9]  He will continue attending football games and men's basketball games in the future.[10]

Markel is a life-long Terrapins fan.  He has been attending Terrapins football and basketball games since childhood.[11]  Now that he has children of his own, he brings his daughters to Terrapins women's basketball games.[12]  Like the others, he will continue to attend women's basketball games in the future, as well as football games and men's basketball games.[13]  Each time a Plaintiff attends a game, however, he cannot understand public announcements, referee calls, and other aurally conveyed information because Defendants have failed to provide for effective communication.

---

[3] Ex. 2, at Answer 4, 17; Ex. 3, at Answer 4, 17; Ex. 4, at Answers 4 and 17.
[4] Deposition of Joseph Innes, Ex. 5, at 12:19 – 13:5.
[5] Declaration of Joseph Innes, Ex. 6.
[6] Innes Dep., Ex. 5, at 64:17-18; Deposition of Kevin Bruce Anderson, Ex. 7, at 70:10-12.
[7] Deposition of Daniel Rinas, Ex. 8, at 14:6-9.
[8] *Id.* at 15:11-14.
[9] *Id.* at 16:8-10.
[10] Declaration of Daniel Rinas, Ex. 9.
[11] Deposition of Sean Markel, Ex. 10, at 32:4-10.
[12] *Id*. at 31:4-6.
[13] Declaration of Sean Markel, Ex. 11.

Both Markel and Innes have tried to follow the Terrapins by accessing the audiovisual material on Defendants' athletics website, UMTerps.com.[14] However, they cannot understand the aural information streamed on the websites, again because of Defendants' failure to provide for effective communication.[15] All three Plaintiffs – Markel, Rinas, and Innes – would watch or "listen to" the aural content on UMTerps.com if Defendants make it accessible.[16]

## II.   Defendants Are Public Entities And Recipients Of Federal Financial Assistance

Defendant University of Maryland, College Park, is a public entity and recipient of federal financial assistance.[17] Defendant Board of Regents of the University System of Maryland is a public entity and the governing body for the University.[18] As the President of the University, Defendant Loh, sued in his official capacity, is able to effectuate any order for injunctive relief entered by the Court.[19]

## III.   Defendants Host Football And Basketball Games

Like many colleges, the University is known for its football team and for its men's and women's basketball teams. The football team plays its home games at the Capital One Field at Byrd Stadium (Byrd Stadium).[20] Since 1990, the year Congress passed Title II, the University has spent more than $87 million renovating and upgrading Byrd Stadium.[21] Byrd Stadium

---

[14] Innes Dep., Ex. 5, at 64:2-4; Markel Dep., Ex. 10, at 53:17 – 54:3.
[15] Innes Dep., Ex. 5, at 64:5-11; Markel Dep., Ex. 10, at 54:18 –55:5.
[16] Innes Dep., Ex. 5, at 64:12 – 65:7; Markel Decl., Ex. 11; Rinas Dep., Ex. 8, at 20:15-18.
[17] Defendant's Answer to Second Amended Complaint ¶ 6, ECF 35.
[18] *Id.,* ¶ 5.
[19] *Id.,* ¶ 7.
[20] *See* Def.'s Response to Interrog. No. 3 "Event Schedule," Ex. 12.
[21] Ex. 1, at Answer 23; Athletic Facilities – Capital One Field at Byrd Stadium, Ex. 13, at 2 (recounting that the University spent more than $104 million on Byrd Stadium since 1990, including $7 million constructing Gossett Field House in 1991, a $45 million "renovation"

3

contains two large videoboards, one located at each end of the stadium, and a ribbon board.[22]
The stadium also contains a public address (PA) system.[23]  The PA system is used to announce
game-related information, such as tackles, sacks, fumbles, recoveries, pass completions, downs,
distance traveled, penalties, and scoring plays.[24]  In addition, the University plays music and
advertisements over the PA system, and projects a post-game press conference.[25]

Of the more than $200 million spent building, renovating, and upgrading these facilities,
prior to 2013, Defendants have made a single expenditure of $8,565 to "perform work associated
with adding close and open captioning capability to the video system for Comcast Center and
Byrd Stadium."[26]  Yet this system has never been used to display captioning during football or
basketball games played at these venues.[27]

The men's and women's basketball teams play their home games at Comcast Center.[28]
The construction of Comcast Center was completed in 2002, at a cost of more than $130
million.[29]  A four-sided videoboard hangs from the center of the stadium.[30]  The arena also
contains five LED ribbon boards, a digital LED scorer's table, and two stanchion digital LED

---

beginning in 1994, a $50.8 million "upgrade" from 2007-2009, and $1.2 million installing a
"state-of-the-art scoreboard" in 2008).

[22] Ex. 1, at Answer 9.

[23] *Id.* at Answer 8.

[24] *Id.*

[25] *Id.*

[26] *Id.* at Answer 24.

[27] *See* Deposition of Joshua Kaplan, Ex. 14, at 52:6 – 57:6 (explaining why the system that
displays captioning at the University's commencement ceremony held at Comcast Center cannot
be used to display captioning on the videoboards or LED ribbon boards during football or
basketball games held at Comcast Center or Byrd Stadium).  Kaplan was testifying as a Fed. R.
Civ. P. 30(b)(6) witness.

[28] *See* Ex. 12.

[29] Ex. 1, at Answer 24.

[30] *Id.* at Answer 9.

displays.[31]  A PA system is used to announce line-ups, substitutions, fouls, and timeouts.[32]  The system is also used to convey arena messages, sponsored materials, special recognitions, pre-game and half-time entertainment, and post-game press conferences.[33]  The equipment that operates the videoboards at Comcast Center also operates the videoboards at Byrd Stadium.[34]

IV.     **Defendants Do Not Provide For Plaintiffs' Effective Communication At University Football Or Basketball Games, Despite Multiple Requests Made Over More Than A Decade**

        Until August 31, 2013, Defendants provided nothing at all to ensure that deaf and hard-of-hearing individuals could access the public address announcements, referee calls, and other aural information conveyed during home football and basketball games.[35]  By then plaintiffs had been requesting captioning at these sporting events for more than a decade.[36]  When Defendants finally implemented a "captioning" system on August 31, 2013, they implemented a system that Plaintiffs had urged them not to use and that did not achieve effective communication.[37]

---

[31] *Id.*

[32] *Id.* at Answer 8.

[33] *Id.*

[34] Kaplan Dep., Ex. 14, at 41:6-7.

[35] *See* Ex. 1, at Answer 14 (when asked to "[i]dentify each action you have taken . . . between 1990 and the present to determine whether and how to provide captioning at Byrd Stadium, Comcast Center, and the University Website," Defendants did not include any efforts made prior to when "Plaintiffs' complaint was received.").

[36] Innes Dep., Ex. 5, at 17:2-10 (describing a formal meeting to request captioning made during the construction phase of Comcast Center, prior to 2002).

[37] *See* Kaplan Dep., Ex. 14, at 71:11-14 (admitting that he knew Plaintiffs "specifically had said they did not want a hand-held option); *see generally* Letter from Plaintiffs to Defendants, April 18, 2013, Ex. 15 (asking Defendants not to use hand-held devices and voice recognition software for captioning); Pelz Decl., Ex. 16 (explaining that hand-held devices are inappropriate vehicles for providing captioning); York Decl., Ex. 17 ¶¶ 13-21(explaining that Defendants' captioning system is "inadequate" and has an accuracy rate of 51%).  Ms. York's qualifications are set forth in her Declaration and her CV, which is attached to it.

A.   **Plaintiffs Repeatedly Requested Line-Of-Sight Captioning For More Than A Decade**

Innes has had a total of four formal meetings with Terrapins Club officials, all athletics department employees, to request line-of-sight captioning at Byrd Stadium and Comcast Center.[38]  Innes first approached the Terrapins Club nearly 14 years ago, around the time that plans for the Comcast Center were being developed.[39]  He met with Andrew Plenn, Executive Director of the Terrapin Club[40] and a University employee.[41] At the meeting, Innes requested line-of-sight captioning for all aspects of the game: post-game press conferences, announcements, emergencies, injuries, player statistics, and other aural information.[42]  He shared the results of h is research, which confirmed that captioning could be displayed on digital scoreboards.[43]  He also provided the names of two agencies that were experts in providing captions.[44]  Plenn informed Innes that he would look into it.[45]

When the Comcast Center opened, there was no captioning.[46]  Innes then asked for another meeting.[47]  He met with another University employee who worked at the Terrapin

---

[38] Innes Dep., Ex. 5, at 16:5-8.
[39] *Id.* at 17:2-10.
[40] *Id.* at 17:2-17.
[41] Anderson Dep., Ex. 7, at 78:14-20 (Terrapin Club is staffed by members of the athletics department); Anderson was testifying as a Fed. R. Civ. P. 30(b)(6) witness.  In Defendants' Answers to Plaintiffs' Interrogatories, Ex. 1, at Answer 2, Timothy McMurray likewise is described as an employee of the University and as a Terrapin Club staff member; Defendants' website, http://www.terrapinclub.com/staff-directory/, describes Timothy McMurray, the current Executive Director of the Terrapin Club Scholarship Fund, as a Senior Associate Athletics Director.
[42] Innes Dep., Ex. 5, at 24:7 – 25:18.
[43] *Id.* at 18:19-19:8.
[44] *Id*. at 24:10-14.
[45] *Id*. at 19:17-20.
[46] *Id*. at 21:7-12.

Club.[48]  That individual claimed that the University was "working on it" (meaning captioning).[49]

Around 2009, the year Defendants spent $ 1.2 million installing a state-of-the art scoreboard in

Byrd Stadium, Innes met with Jonathan Evans, another University employee, to request line-of-

sight captioning.[50]  These last meetings followed the same course as the others:  Defendants'

employees promised to "look into" providing line-of-sight captioning but never actually

provided the service.[51]

        Supplemental to these meetings, Innes had many contacts with officials from the

University.[52]  For example, Innes regularly interacted at games with Deborah Yow, then the

University Athletic Director.[53]  She indicated that she was aware that he had requested

captioning at games.[54]  Jonathan Evans also approached Innes at a football game to tell Innes

that "he felt [the University] had some solutions, and he would be in touch."[55]  But this follow-

up never occurred.[56]  Despite the repeated meetings and incidental conversations, no captioning

was ever implemented.

        Markel also separately made requests for captioning.  During the past several years,

whenever Markel has gone to a football or basketball game, he has asked at the ticket window

---

[47] *Id*. at 21:7-13.
[48] *Id*. at 21:14 – 23:4; Anderson Dep., Ex. 7, at 78:14-20 (Terrapin Club is staffed by members of the athletics department).
[49] Innes Dep., Ex. 5. at 26:21 – 27:10.
[50] *Id.* at 27:11 – 28:2; 30:13 – 32:14.
[51] *Id.* at 24:9-14.
[52] *Id*. at 29:17-21; 35:4 – 36:13.
[53] *Id.* at 34:19 – 36:18.
[54] *Id*. at 36:11-13.
[55] *Id.* at 31:12-32:19.
[56] *Id.*

whether captioning is available.[57]  Occasionally the ticket-takers would talk amongst themselves

or call over a supervisor to answer his question.[58]  But until the Fall of 2013, they always

answered no.[59]  All of these employees report to individuals within the Athletics Department at

the University of Maryland.[60]  Although Rinas did not independently request the University of

Maryland to provide captioning, he knew of Innes's efforts to secure captioning and believed

these efforts "were in good hands" and that Innes "was already taking care of it."[61]

The Defendants failed to produce any evidence that they ever looked into captioning at

football and basketball games prior to 2013.[62]

In February 2013, Plaintiffs wrote a letter to the University, again putting Defendants on

notice of their claims and requested captioning on scoreboards or ribbon boards at Byrd Stadium

and the Comcast Center.[63]  It read:

> On behalf of all those similarly situated, Dr. Innes respectfully demands that the
> University of Maryland caption the announcements made on the public address
> systems on the scoreboards, LED ribbon boards, and/or Jumbotrons at Byrd
> Stadium and Comcast Center.  Specifically, Dr. Innes requests that the University
> of Maryland caption anything that is said by the referee, the public address

---

[57] Markel Ans. To Interrogs., Ex. 3, at Answer 5; Markel Dep., Ex. 10, at 34:12 – 36:21. As
explained by Mr. Anderson and Mr. Kaplan, the ticket agents are employees of the University
and are directed to raise customer concerns or questions with their superiors. *See* Anderson Dep.,
Ex. 7, 78:5-79:3; Kaplan Dep., Ex. 14, 20:11-22:7.
[58] Markel Ans. to Interrogs., Ex. 3, at Answer 5.
[59] Markel Dep., Ex. 10, 38:18-39:9.
[60] Kaplan Dep., Ex. 14, 96:19 – 97:9.
[61] Rinas Dep., Ex. 8, at 22:15 – 23:1.
[62] Kaplan Dep., Ex. 14, at 48:20 – 49:6; 59:21 – 60;3; Ex. 1, at Answer 12 (when asked to
"describe each and every communication since 1990 you have had with any person, including
Plaintiffs, regarding requests for or implementation of captioning in Byrd Stadium or Comcast
Center," listing only interactions occurring on July 10, 2013, and thereafter; notably, this Answer
omits Plaintiffs' February 8 and April 18 letters, as well as Plaintiffs' contact with individuals no
longer employed at the University of Maryland).
[63] *See* Letter from Plaintiffs to Defendants, Feb. 8, 2013, Ex. 18.

announcer, or anyone else using the public address system. Captions placed on the scoreboards, LED ribbon boards, and/or Jumbotrons at Byrd Stadium and Comcast Center should be made visible from any seat in each venue.  With captions, Dr. Innes and all deaf or hard of hearing individuals will have equal access to and an equal opportunity to enjoy Terrapin football and men's and women's basketball games.[64]

Defendants responded by saying they would use voice recognition software and handheld devices to generate and display captions.[65]  Plaintiffs responded that such a system would not result in effective communication.[66]  They urged Defendants to provide the line-of-sight captioning they had requested all along.[67]

> **B.    Defendants Finally Responded To Plaintiffs' Captioning Requests With An Ineffective System Plaintiffs Had Urged Them Not To Implement**

Despite ongoing communication between counsel, Defendants did not provide line-of-sight captioning.  Instead, they implemented the very approach that Plaintiffs had urged them not to take:  "captioning" generated by voice recognition software and displayed on handheld devices.  The results were even worse than Plaintiffs had imagined.  Defendants' "captioning" system generates text using a "live speech to text engine" called YouCaption.[68]  YouCaption works by having a person, called a "voicewriter," speak into a microphone, repeating the information conveyed over the public address system.[69]  Software automatically transcribes the voicewriter's speech into text which is then displayed on the website

---

[64] *Id.* at 2-3.
[65] Letter from Defendants to Plaintiffs, March 29, 2013, Ex. 19, at 1-2.
[66] *See* Ex. 15 at 1-3.
[67] *See id.*
[68] Ex. 1, at Answer 5.
[69] *Id.*

"closedcaptioning.umd.edu."[70]  Attendees access the website through handheld devices.[71]

Importantly, Defendants chose not to hire professional voicewriters to generate the text, opting

instead for a revolving door of journalism students without any inquiry into whether or not they

have voicewriting experience.[72]

For patrons (like both Markel and Rinas) who do not own a handheld device compatible

with the University's software, the University loans out iPads for use during games.[73]  To obtain

one of these iPads, Plaintiffs must complete the "iPad Registration and Liability Form," which

asks for their full name, driver's license number, full credit card number, a local address, their

telephone number, and their email address,[74] and surrender a photo identification.[75]  This form

further advises Plaintiffs that they must reimburse the University at least $750.00 if the iPad or

"associated peripheral equipment is intentionally damaged, stolen, or lost."[76]  Upon returning the

iPad, Plaintiffs must fill out an additional form disclosing yet more personal information.[77]

Plaintiffs had asked that Defendants not use handheld devices to display captioning based

on their previous negative experience using such a system.  They explained that most handheld

devices cannot be viewed in sunny weather or in wet weather.[78]  Requiring an individual to hold

a device for the duration of a game interferes with their ability to eat and drink and, in the case of

---

[70] *Id.*  This website is the second that Defendants have used.  The first website went down the night before the Maryland v. Virginia game on October 12, 2013.  *Id.* at Answer 7.  Because no website was available that day, there was no captioning available. *Id.*

[71] *Id.* at Answer 6.

[72] Kaplan Dep., Ex. 14, 69:4-12; 77:18-78:4.

[73] Ex. 1, at Answer 6.

[74] *Id.* at Answer 6; iPad Registration and Liability Form, Ex. 20, at 1.

[75] Markel Dep., Ex. 10, at 37:7-8.

[76] Ex. 20, at 1.

[77] Ex. 1, at Answer 6; iPad Return and Liability Form, Ex. 21.

[78] *See* Ex. 15, at 1-2.

deaf and hard-of-hearing fans, their ability to converse with their friends in American Sign Language.[79]  Further, deaf and hard-of-hearing fans who do not own a compatible handheld device would have to wait in additional lines and fill out additional paperwork on game day to receive captioning access.[80]  Finally, Plaintiffs cautioned Defendants against using voice recognition software to generate the captions, explaining that "the NAD is unfamiliar with any [voice recognition software] that actually work[s] as advertised."[81]

Upon testing Defendants' system, Plaintiffs encountered all the obstacles they had predicted and more.  Innes and Markel each attempted to access aural information during home football games through the handheld captioning system that the University provided.[82]  Innes attempted to access captioning through his iPhone, and Mr. Markel attempted to access captioning through an iPad.[83]  Each of them found the handheld system unusable.[84]  First, the Internet connection that fed the captions to their devices was unreliable.  The first time that Innes tried to use the captioning system, the website that hosted the captions failed completely and he had no access to the captions.[85]  In subsequent games, the captions froze frequently[86] and, when they began again, would scroll quickly through the text, making it unreadable.[87]  Even when the

---

[79] *Id.*, at 2.
[80] *Id*.
[81] *Id.*, at 1.
[82] Innes Dep.,Ex. 5, 38:5-12; Markel Dep., Ex. 10, 36:20-38;12.
[83] Innes Dep.,Ex. 5, 39:9-17; Markel Dep., Ex. 10, 36:20-38:12.
[84] Innes Dep., Ex. 5, 42:18-43:14; 44:18-45:8; Markel Dep., Ex. 10, 37:15-38:12.
[85] Innes Dep., Ex. 5, 40:14-20.
[86] Markel Dep., Ex. 10 at 37:18-20; Ex. 17, Declaration of Heather York at ¶ 13b. ("The system regularly froze and, upon refreshing, I had to wait for the entire game's captions to re-load before new captions would appear."); Declaration of Jeff Pelz, Ex. 16 at p. 11 (caption system froze during testing). Dr. Pelz's CV is attached to his declaration.
[87] Markel Dep., Ex. 10, 37:18 – 38:1; Ex. 17, at 5.

captions did not freeze, they often appeared two plays late,[88] or after the players had left the field,[89] making it difficult or impossible for deaf and hard-of-hearing users to connect the captions to what had happened on the field.[90]  Innes also noticed that, due to the small screen size of the iPhone he used to access captions, the captions either were too small to read easily or were too large to fit full sentences on the screen.[91]  Finally, reading captions on the handheld device caused Innes to miss what was happening on the field.[92]

      Plaintiffs' two expert witness further illuminate why Defendants' system is ineffective. Plaintiffs' line-of-sight expert, Jeff Pelz, submitted a Declaration explaining why handheld devices are unsuitable as a vehicle for displaying captioning.  Accessing captions via a handheld device requires users to completely remove their gaze from the football field or basketball court at frequent intervals not only to read the captions that appear but to monitor whether new captions have appeared.[93]  Because of the distance that users have to move their gaze to look at the field or court and then at the handheld device, users cannot use their peripheral vision to monitor one while they are looking at the other.[94]  This is a different experience from watching a football or basketball game using line-of-sight captioning, where the viewer can monitor either the field/court or the captions in their peripheral vision while looking at the other.[95]  As a result of the large gaze-shift required for handheld devices, the time that users spend both reading

---

[88] Innes Dep., Ex. 5, at 44:5-14.
[89] Markel Dep., Ex. 10, at 38:1-4.
[90] Innes Dep., Ex.5, 43:5-6; 49:16-20; *See also* Ex. 16, at ¶ 21.
[91] Innes Dep., Ex. 5, 42:20-21, 43:19-44:1.
[92] *Id.* at 49:8-20.
[93] Ex. 16, at ¶ 23, p.11; Innes Dep., Ex. 5, at 49:4-20.
[94] Ex. 16, at ¶23 p. 11.
[95] *Id.* at ¶ 20.

captions and monitoring their devices for new captions takes away from the time spent watching the game they have paid to see.[96]  Further, it reduces deaf and hard-of hearing-fans' ability to understand what is going on during the game.[97]

Plaintiffs' expert, Heather York, a captioning consultant, reviewed the captioning system and determined that "the captions are of such poor quality that they are of no use to the user."[98] She evaluated the quality of realtime captions based on the industry standards for accuracy, completeness, and timeliness.[99]  York described the caption quality as "barely measurable" due to the lack of "sensible punctuation, especially end-of-sentence markers."[100]  Consequently, captions often appeared as a run-on sentence, with no indication of when one phrase ended and another began.[101]  Further, the captions were riddled with easily correctable errors such as players' last names and entire phrases that made no sense.[102]  Based on the inaccuracy of the transcription alone, York concluded that "one cannot read this text, make sense of it, and still watch the action on the field or court."[103]  Indeed, the sample of the transcript she could measure had an accuracy rate of 51% – "unacceptable quality" and far below the industry standard of 98%.[104]

---

[96] Ex. 16, at at ¶ 23, p. 11; Innes Dep., Ex. 5, 44:18-45:8.
[97] Ex. 16, at ¶ 21.
[98] Ex. 17, at ¶ 12.
[99] *Id.* at ¶ 16.
[100] *Id.* at ¶ 20.
[101] *Id.* (describing and showing captioning with insufficient punctuation); *cf.* Ex. 16, at p. 15 (showing screenshot of captioning with insufficient punctuation).
[102] York Decl., Ex. 17, at ¶¶ 20-21.
[103] *Id.* at ¶ 20a.
[104] *Id.* at ¶ 20.

Beyond the "unacceptable" accuracy rate, the captions showed serious deficiencies in completeness and timeliness. York noted several pre-recorded videos that could have been captioned in advance (with the captions displayed on the videoboard) and instead were not captioned at all.[105] She further noted that referee calls were not captioned, sound effects were not captioned, and "[e]ven when captions appear on-screen, entire sentences were dropped."[106] Finally, the inaccurate, incomplete captions appeared at a standard lag time of 25 seconds – a lag time more than quadruple the industry standard of 2-6 seconds.[107] She explained:

> This delay prohibits the user from keeping track of the actual pace of the game. I had to stare at my device, waiting for captions to appear, missing on-field and on-court action while doing so, further impeding my understanding of the game. The only instances where timeliness was not an issue was in the pre-scripted announcements before the games and during halftime – in those instances the script scrolled by almost so fast as to be unreadable.[108]

She concluded that "[t]he University's system produces inadequate captions, providing a disservice to those attendees who rely on captioning."[109]

## V.     Defendants Do Not Provide Effective Communication To Deaf Or Hard-Of-Hearing Terrapins Fans On Their Athletics Website, www.UMTerps.com

In addition to hosting football and basketball games for live audiences, Defendants stream aural content on a website that is designed to promote and display football, basketball, and other University of Maryland athletic games.[110] Defendants host this content on TerpsTV,

---

[105] *Id*. at ¶ 19a.
[106] *Id*. at ¶ 19b, c & d.
[107] *Id*. at ¶ 18.
[108] *Id*. at ¶ 18.
[109] *Id*. at ¶ 21.
[110] Kaplan Dep., Ex. 14, 136:15 – 137:5.

which is a component of Defendants' athletics website, UMTerps.com.[111]  The content includes

live streams of non-televised sporting events, including football and basketball games that are

not televised, as well as "non-revenue" sports such as lacrosse and field hockey.[112]  The content

also includes Coach Randy Edsall's weekly radio show,[113] and preproduced videos designed to

give fans insight into players or to promote upcoming events.[114]  Defendants are solely

responsible for producing the content for TerpsTV and would be responsible for supplying

captioning, if and when they choose to provide it.[115]

Beyond boosting fan attendance, TerpsTV generates significant revenue.  The company

that hosts the website pays the University between REDACTED and REDACTED annually,[116] REDACTED

REDACTED the amount the University pays to generate content for TerpsTV.[117]  In addition,

Defendants are entitled to REDACTED

REDACTED                                                    [118]  Yet Defendants do not display

open or closed captioning for any of this audio or video content.[119]

## LEGAL STANDARD

Summary judgment is appropriate if the movant shows that there is "no genuine issue as

to any material fact and the movant is entitled to judgment as a matter of law," based on the

---

[111] Deposition of Gabriel Unterman, Ex. 22, 32:7-11, 33:19-21.  Mr. Unterman was a Fed. R. Civ. P. 30(b)(6) witness.
[112] Def.'s Answer to Request No. 28 "Live Events on umterps.com," Ex. 23.
[113] Def.'s Answer to Pl's 2d Am. Compl. ¶ 17 ECF 35.
[114] Kaplan Dep., Ex. 14, 136:15 – 137:5.
[115] Kaplan Dep., Ex. 14, at 110:20-112:17.
[116] Agreement Between Defendants and NeuLion, Inc., Ex. 24, at ¶ 4.4(a).
[117] Anderson Dep., Ex. 7, at 33:6-10 (the University spends approximately $50,000-60,000 annually on TerpsTV content).
[118] Ex. 24 at ¶ 4.5(a)-(b)(iv).
[119] York Decl., Ex. 17 at ¶ 25.

pleadings, depositions, answers to interrogatories, admissions, and properly sworn affidavits. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Although the Court must "view the facts and draw all reasonable inferences in the light most favorable to the non-moving party . . . the non-moving party cannot solely rely on 'mere allegations or denials of [his] pleadings.'"  *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013) (quoting *Liberty Lobby*, 477 U.S. at 256).  Rather, "[h]e must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'"  *Id.* (quoting *Liberty Lobby*, 477 U.S. at 252).  A party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences.  *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330-31 (4th Cir. 1998).  Additionally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment.  *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

As set out below, based on the undisputed material facts, Plaintiffs are entitled to summary judgment as to liability on all claims, and to injunctive and declaratory relief.

## ARGUMENT

### I.     Defendants Have Violated Title II And Section 504 By Failing To Ensure Effective Communication

"[T]he ADA requires [athletic teams] to provide deaf and hard-of-hearing fans equal access to the aural information broadcast over the stadium bowl public address system." *Feldman v. Pro Football, Inc.*, 579 F. Supp. 2d 697, 709 (D. Md. 2008), *aff'd* 419 Fed. App'x 381 (4th Cir. 2011) (granting plaintiffs' motion for summary judgment establishing that defendant's failure to provide effective auxiliary aids and services in a football stadium violated Title III of the ADA); *see also Independent Living Resources v. Oregon Arena Corp.*, 982 F.

16

Supp. 698, 714 (D. Or. 1997) (granting plaintiffs' motion for partial summary judgment establishing that defendant's failure to properly distribute wheelchair-accessible seating violated Title III of the ADA).[120]  Yet despite repeated requests by Plaintiffs, made over the course of more than a decade, Defendants have continuously failed to provide the auxiliary aids and services that Plaintiffs need for effective communication at football and basketball games and on Defendants' athletics website. This failure violates Title II of the ADA and Section 504 of the Rehabilitation Act.  As there are no genuine disputes surrounding the facts material to the Plaintiffs' claims, Plaintiffs are entitled to summary judgment as to liability on all claims.

A.   **Title II And Section 504 Require Defendants To Ensure Effective Communication With Plaintiffs And Give Primary Consideration To Their Requested Auxiliary Aids And Services**

The Americans with Disabilities Act "provides a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *Equal Rights Ctr. v. Niles Bolton Assocs.*, 602 F.3d 597, 602 (4th Cir. 2010) (quoting 42 U.S.C. § 12101(b)); *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 782 (7th Cir. 2002) (affirming grant of plaintiffs' motion for summary judgment under Title II of the ADA). Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et. seq.*, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibit discrimination against persons with disabilities. Title II applies to public entities and Section 504 applies to all recipients of federal financial

---

[120] The communication access provisions of Title III of the ADA are nearly identical to the Title II communication access provisions. *Compare* 28 C.F.R. § 35.160(a)(1), (b)(2) *with* 28 C.F.R. § 36.303.

17

assistance.  *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).  Defendants are covered entities under both Title II and Section 504.[121]

The standards for determining liability under the two statutes are largely the same.  *See* 42 U.S.C. § 12133 ("[T]he remedies, procedures, and rights set forth in [§ 504 of the Rehabilitation Act] shall be the remedies, procedures, and rights this subchapter [the ADA] provides....").  Congress mandated that "the Title II regulations as to . . . 'communications' be consistent with the Section 504 regulations codified at 28 C.F.R. part 39."  *K.M. ex. rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1099 (9th Cir. 2013) (citing 42 U.S.C. § 12134).  The regulations under both statutes are entitled to deference.  *Id.* at 1092; *Chisolm v. McManimon*, 275 F.3d 315, 325 (3d Cir. 2001); *c.f. Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 370 (D. Md. 2011) ("Although the Supreme Court has yet to decide whether the regulations are entitled to the full deference afforded under *Chevron* [,*U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984)] the Court has counseled that the views expressed by the Department of Justice in the implementing regulations 'warrant respect.'") (citing *A Helping Hand, LLC v. Baltimore C'nty*, 515 F.3d 356, 362 (4th Cir. 2008)).

Pursuant to Title II, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013) (quoting 42 U.S.C. § 12132) (affirming district court's grant of plaintiffs' motion for preliminary relief under Title II and § 504). Pursuant to § 504, "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his

---

[121] *See* discussion *supra* at 3.

disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794.  "Services, programs, and activities" may encompass "anything a public entity does." *Seremeth v. Bd. of C'nty Com'rs Frederick C'nty*, 673 F. 3d 333, 338 (4th Cir. 2012) (citing 28 C.F.R. Pt. 35, App. B; see also H.R.Rep. No. 101-485(II), 101st Cong., 2d Sess. 84 (1990), 1990 U.S.C.C.A.N. 303, 367 (stating that Title II is intended to apply to "all actions of state and local governments.")); *accord Innovative Health Sys. v. City of White Plains*, 117 F.3d 37 (2d Cir. 1997) (affirming district court's grant of plaintiffs' motion for summary judgment that defendant's zoning decision violated Title II).

A "qualified individual with a disability" is "an individual with a disability who, with or without . . . the provision of auxiliary aids or services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2).  To prevail under a Title II or a § 504 claim, "a plaintiff must show that she was excluded from participation in, or denied the benefits of, a program or service offered by a public entity, or subjected to discrimination by that entity."  *Constantine*, 411 F.3d at 499 (emphasis omitted); *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 826 (D. Md. 1998).[122]

─────────────

[122] The statutory language has a minor difference:  Title II prohibits discrimination "by reason of" disability, while § 504 prohibits discrimination "solely by reason of" disability.  *See Paulone*, 787 F. Supp. 2d. at 370-71.  This difference is not relevant in this case.  Neither party alleges that discrimination occurred for any reason other than the Plaintiffs' disability.

1.      **Title II And Section 504 Require Defendants To Ensure Effective Communication With Plaintiffs**

The DOJ Title II regulations require public entities to "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are *as effective as* communications with others."  28 C.F.R. § 35.160(a)(1) (emphasis added); *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F. 3d 1088, 1101 (9th Cir. 2013) ("[T]he Title II effective communications regulation, requires public schools to communicate 'as effective[ly]' with disabled students as with other students.").  This provision is known as the "effective communication" standard.[123]  To ensure effective communication, "[a] public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."  28 C.F.R. § 35.160(b)(1); *accord Seremeth*, 673 F.3d at 339.

Auxiliary aids and services include:  "open and closed captioning, including real-time captioning . . . or other *effective* methods of making aurally delivered materials available to individuals with hearing impairments."  28 C.F.R. § 35.104 (emphasis added); *accord Seremeth*, 673 F.3d at 339; *Duvall v. C'nty of Kitsap*, 260 F. 3d 1124, 1136 (9th Cir. 2001).  Defendants cannot satisfy their obligations to ensure effective communication by furnishing auxiliary aids and services that are not effective for plaintiffs.  *Feldman v. Pro Football, Inc.*, 419 Fed. App'x at 391 (affirming district court's grant of judgment in favor of plaintiffs because defendants provided an auxiliary aid or service that was ineffective for plaintiffs).

---

[123] *See generally* DOJ, Revised ADA Requirements:  Effective Communication, *available at* www.ada.gov/effective-comm.pdf.

2.    **Title II Requires Defendants To Give Primary Consideration To Plaintiffs' Requested Auxiliary Aids And Services**

In addition to requiring effective auxiliary aids and services , the DOJ Title II regulations require public entities to "give primary consideration to the requests of individuals with disabilities" in the selection of such aids and services.  28 C.F.R. § 35.160(b)(2).  The DOJ recently published an update to its series of Technical Assistance manuals, specifically addressing effective communication.[124]  This publication explains that, pursuant to the "primary consideration" provision:

> When choosing an aid or service, title II entities are *required* to give primary consideration to the choice of aid or service requested by the person who has a communication disability.  *The state or local government must honor the person's choice*, unless it can demonstrate that another equally effective means of communication is available, or that the use of the means chosen would result in a fundamental alteration or in an undue burden (see limitations below).  If the choice expressed by the person with a disability would result in an undue burden or a fundamental alteration, the public entity still has an obligation to provide an alternative aid or service that provides effective communication if one is available.[125]

The failure to take these steps violates Title II and Section 504:  "The injury is the failure to make communication as effective as it would have been among [defendants] and persons without disabilities . . . ."  *Seremeth*, 673 F. 3d at 337.  *See also Feldman v. Pro Football, Inc.*, 419 Fed. App'x 381, 390 (4th Cir. 2011) (holding that Title III of the ADA requires FedEx Field to provide auxiliary aids and services at football games); DOJ, Settlement Agreement Between the United States of America and the Cavaliers Operating Co. (LLC), Exhibit 27, available at http://www.ada.gov/cavaliers.htm (Title III of the ADA requires stadium to provide captioning

---

[124] *See* DOJ, Revised ADA Requirements: Effective Communication, *available at* www.ada.gov/effective-comm.pdf (2014), at page 6 for discussion of "primary consideration."
[125] *Id.* (second emphasis added).

"on the scoreboards and video monitors" during Cleveland Cavaliers basketball games). *See also* 28 C.F.R. § 35.160(a)(1).

The undisputed facts show that Defendants have neither provided effective communication nor honored the preferences of the Plaintiffs. Therefore, Plaintiffs are entitled to summary judgment as to liability.

### B. Defendants Discriminated Against Plaintiffs Based On Their Disability By Failing To Provide Effective Communication During Football And Basketball Games.

Providing deaf and hard-of-hearing fans equal access to aural information requires implementing auxiliary aids and services that ensure effective communication. *Feldman,* 579 F. Supp. 2d at 708-09. Defendants cannot meet this obligation by implementing auxiliary aids and services that are unusable to Plaintiffs. *Id.* at 709.

Currently, Defendants do not provide auxiliary aids and services that ensure effective communication. Plaintiffs' letters, deposition testimony, and expert witnesses have all explained that the system of voice recognition software and handheld devices that Defendants have implemented does not ensure effective communication. See Section IV.2 *supra*. Defendants have brought forth no fact witnesses and no expert witnesses to rebut these assertions. There is, therefore, no dispute of material fact about this issue. In addition to failing to provide for effective communication with Plaintiffs, Defendants have also failed in their obligation to give primary consideration to Plaintiffs' requests. Defendants do not dispute that Plaintiffs previously requested line-of-sight captioning,[126] and Defendants do not dispute that they do not provide line-of-sight captioning. Because Title II requires Defendants to give primary consideration to

---

[126] Def.'s Answer to 2d Am. Compl., at ¶ 28; Ex. 19.

honoring Plaintiffs' requests for line-of-sight captioning, *K.M.*, 725 F.3d at 1099; *Paulone*, 787 F. Supp. 2d at 397, Defendants cannot credibly dispute that they are in violation of Title II and Section 504.

Therefore, Plaintiffs are entitled to summary judgment as to liability.

### C.   Defendants Have Demonstrated Deliberate Indifference To Plaintiffs' Need For Auxiliary Aids And Services.

Under Title II and Section 504, intent can be established by showing deliberate indifference. *Adams v. Montgomery College (Rockville)*, 834 F. Supp. 2d. 386, 393-94 (D. Md. 2011). "Defendants intentionally violate the ADA and the Rehabilitation Act by demonstrating deliberate indifference when they '[have] notice of the potential risk of their decision, and clearly [refuse] the accommodation knowingly.'" *Id.* at 394 (citing *Proctor*, 32 F. Supp. 2d at 828). Thus, "compensatory damages are available for failure to accommodate a plaintiff if defendants 'acted knowingly, voluntarily, and deliberately,' even if the violations resulted from mere 'thoughtlessness and indifference' rather than because of any intent to deny Plaintiff's rights." *Id.* (citing *Proctor*, 32 F. Supp. 2d at 828).

Defendants received "notice of the potential risk of the decision" not to provide line-of-sight captioning for football and basketball games. Plaintiffs repeatedly contacted Defendants to request auxiliary aids and services. Plaintiffs' efforts to provide Defendants with notice included four formal meetings with University employees, numerous informal meetings with University employees ranging from ticket-takers to the University's Athletics Director, and multiple letters written by Plaintiffs' attorneys. Defendants have advanced no evidence to contradict Plaintiffs' assertions. Therefore, there is no genuine issue of material fact that Defendants had notice of the potential risk of their decision.

Further, Defendants "clearly refused the accommodation knowingly." *See Proctor*, 32 F. Supp. 2d at 829.  Defendants have produced no evidence to indicate that they took any steps toward providing line-of-sight captioning during the first decade that Plaintiffs repeatedly requested it.[127]  Even after repeated contact with Plaintiffs' attorneys in 2013, Defendants did not provide line-of-sight captioning.  Instead, they implemented a system that, consistent with what Plaintiffs had explained to them already, did not provide effective communication.

The record contains no evidence to contradict Plaintiffs' assertions that they repeatedly requested line-of-sight captioning, that Defendants refused to provide it, and that years later, Defendants implemented a system they knew would not result in effective communication. Because Defendants have nothing to rest on but their own denials, the Court should find Defendants liable for an intentional violation of Title II and Section 504 and set this case in for a trial on damages.

> **D.    Defendants Are Also Discriminating Against Plaintiffs Based On Their Disability By Failing To Caption Aural Content Streamed On The Website www.UMTerps.com.**

Defendants are further violating Title II and Section 504 by failing to provide for effective communication on their website.  As with athletic events, the University is required to make its web programming accessible to individuals who are deaf.  As set out in greater detail above, Section 504 applies to all the activities of a program or activity that receives federal financial assistance.  29 U.S.C. § 794(a).  A "program or activity" includes all of "a college,

---

[127] *See* Kaplan Dep., Ex. 14, at 48:20 – 49:5; Ex. 1, at Answer 14 (when asked to "[i]dentify each action you have taken . . . between 1990 and the present to determine whether and how to provide captioning at Byrd Stadium, Comcast Center, and the University Website," Defendants did not include any efforts made prior to when "Plaintiffs' complaint was received.").

university, or other postsecondary institution, or a public system of higher education[.]"  29

U.S.C. § 794 b(2)(A).  Under a plain reading of the statute, UMTerps.com is a service provided

by the University and is therefore covered by Section 504.  By failing to provide captioning for

deaf users of UMTerps.com, Defendants are excluding them from participation in or denying

them the benefits of the website in contravention of Section 504.  Similarly, Title II covers  ". . .

all services, programs, and activities provided or made available by public entities."  35 C.F.R. §

35.102.  "Services, programs, and activities" may encompass "anything a public entity does."

*Seremeth,* 673 F. 3d at 338.  Because UMTerps.com is a service, program, or activity of a public

entity, it must be made accessible to deaf users.

      Defendants do not dispute that they provide no auxiliary aids and services to ensure that

deaf and hard-of-hearing patrons can access the aural content streamed on their website.  Further,

they admit that they have sole control over providing captioning on UMTerps.com and that it is

possible to do so.[128]  Plaintiffs' expert Heather York said that technology now exists to easily

add captions to webstreams.[129]  Indeed, Ms. York said that NeuLion, the company that hosts

UMTerps.com, distributes captioned National Football League and National Hockey League

programming on the internet.[130]  She also reported that some of the programming displayed on

UMTerps.com already is captioned for display on other media.[131]  *Id.*

      For the foregoing reasons, Defendants are in violation of Title II and § 504 and the Court

should grant Plaintiffs' motion for summary judgment as to liability on those claims.

---

[128] Kaplan Dep., Ex. 14, at 112:5-9; 113:21 – 114:3.
[129] Ex. 16 ¶¶ 23 & 25.
[130] *Id.* ¶ 24.
[131] *Id.* ¶ 25 a.

**II.      Plaintiffs Are Entitled To Injunctive And Declaratory Relief**

In order to obtain injunctive relief under Title II of the ADA:

> [o]nce a party has demonstrated actual success on the merits, the court must balance three factors to determine whether injunctive relief is appropriate:  (1) the threat of irreparable harm to the movant; (2) the harm to be suffered by the nonmoving party if the injunction is granted; and (3) the public interest at stake.

*Adams*, 834 F.Supp.2d at 395 (citing *Pathways Psychosocial v. Town of Leonardtown, Md.*, 223 F. Supp. 2d 699, 717 (D. Md. 2002)).  The same standard applies to Section 504.  *Pathways Psychosocial*, 223 F. Supp. 2d at 717.  Plaintiffs have clearly met this standard.  The threat of continuing irreparable harm is evidenced by the continuing failure of Defendants to provide effective communication to Plaintiffs.  On the other hand, there will be no harm to the Defendants by their being required to comply with applicable federal law.  Similarly, the public interest will be served by requiring the University of Maryland to provide effective communications with deaf and hard-of-hearings sports fans, coupled with the general public interest of requiring public institutions to comply with federal law.

Plaintiffs also are entitled to a declaratory judgment setting out the obligations of the Defendants.  *Pathways Psychosocial*, 223 F. Supp. 2d at 717; *Feldman*, 579 F. Supp. 2d at 710.  Those obligations are:  the captioning of all aural content at basketball and football games held at Comcast Arena and Byrd Stadium, and the captioning of all aural content on the UMTerps.com website or any successor website operated for the athletics department.

<u>CONCLUSION</u>

Because there are no disputes of material fact and Plaintiffs are entitled to partial summary judgment as a matter of law, Plaintiffs' Motion should be granted.  The Court should enter an Order finding Defendants liable for their violations of Title II and Section 504 and enter

an injunction requiring Defendants to display captioning of all aural information in Comcast

Center and Byrd Stadium on ribbon boards or scoreboards of a size and in locations that make

the captions readable from all seats in the two venues.  Additionally, the Court should order

captioning of all aural material on UMTerps.com.  Finally, this case should be set in for a trial on

damages.

Respectfully Submitted,

  /s/
Joseph B. Espo, Fed. Bar No. 07490
Brooke E. Lierman, Fed. Bar No. 17879
BROWN, GOLDSTEIN & LEVY, LLP
120 E. Baltimore Street, Suite 1700
Baltimore, Maryland  21202
T:  (410) 962-1030
F:  (410) 385-0869
jbe@browngold.com
blierman@browngold.com

Caroline Jackson, Fed. Bar No. 18545
THE NATIONAL ASSOCIATION OF
THE DEAF LAW AND ADVOCACY
CENTER
8630 Fenton St., Suite 820
Silver Spring, Maryland  20910
T:  (301) 587-1788
F:  (301) 587-1791
caroline.jackson@nad.org

*Attorneys for Plaintiffs*[132]

## REQUEST FOR HEARING

Plaintiffs request a hearing on their Motion.

  /s/
Joseph B. Espo

---

[132] Attorneys for Plaintiffs gratefully acknowledge the contributions of Michelle Sliwinski, student at the George Washington University School of Law.