**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| JOSEPH INNES, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. DKC 13-cv-2800 |
| BOARD OF REGENTS, *et al.*, | * | |
| Defendants. | * | |
| | * | |

* * * * * * * *

**DEFENDANTS' MEMORANDUM OF LAW**
**IN SUPPORT OF MOTION TO**
**EXCLUDE EXPERT OPINION OF HEATHER YORK**

Defendants, by their attorneys, submit this memorandum in support of their motion to exclude the testimony of Heather York, who has been designated by Plaintiffs as an expert witness.

**FACTS**

Heather York is the Vice President of Marketing for VITAC, a commercial vendor of captioning services. Ex. 1, York Dep. at 12:9-11; Ex. 2 at 1. She has been designated by Plaintiffs as an expert in captioning. She will testify that, in her opinion, the University of Maryland must supply Plaintiffs with captioning that has an accuracy rate of 98 percent to provide effective communication. Ex. 2 at 6. She will also testify that in her opinion the captioning must be verbatim. Ex. 1, York Dep. at 67:18-19.

Ms. York has never qualified to testify as an expert. *Id*. at 23:21-24:5. She has a

bachelor's degree in English, writing and journalism. *Id*. at 14:2. She has no further education beyond this. *Id*. at 15:6-9. She has no formal training in linguistics or speech pathology (*Id*. at 16:2-4), disability services (*Id*. at 16:5-7), educational psychology (*Id*. at 16:11-13), or as a human factors specialist (*Id*. at 16:14-16). She has published no articles in scholarly publications related to this subject. *Id*. at 18:6-19:7. She has worked exclusively in sales, marketing, and government relations. *Id*. at 10-13. She holds no professional licenses, *id*. 21:21-22:11, and is not entirely familiar with the certifications available in the captioning field ("not entirely sure what the term, CCR, Certified Caption Reporters stands for") *Id*. at 22:7-8.

Her analysis of the captioning provided by the University of Maryland consisted of a simple arithmetic calculation that could be performed by any layperson ("counting the words spoken, subtracting the errors, divided by the words written"). *Id*. at 50:21-51:1, 54:6-7. She conceded that this approach tended to overstate the degree to which the text is incomprehensible. *Id*. at 54:8-11.

She stated that she recognizes Larry Goldberg as an authority on captioning. *Id*. at 24:14-25:1. When presented with a research study prepared by Mr. Goldberg using weighted averages to more accurately assess the quality of captioning (Ex. 3), she professed familiarity with it. *Id*. at 51:12-53:7. But when asked to interpret even the most basic elements of the report, she was befuddled. She did not know that WER stands for "word error rate". *Id*. at 57:5-9. She appeared completely unfamiliar with Goldberg's computation methodology, stating "there's no way to do this right now." *Id.* at 54:1-20. This is not entirely surprising given that, when asked by Plaintiffs to evaluate the accuracy of the University of Maryland's

captioning, she consulted someone else in her firm about the best way to go about such an evaluation. *Id*. at 50:12-51:6.

Ms. York never met with the Plaintiffs. *Id*. at 43:10-14. She admitted having no way of knowing what Plaintiffs actually comprehended when attending games. *Id*. at 64:3-6. She admitted being completely unfamiliar with any research that establishes how error rates correlate with actual comprehension:

> Q. Is there research that establishes how error rates in captioning correlate with comprehension?
>
> A. I'm not entirely sure.
>
> Q. But you can see why it would be important, can't you, because if we say that the error rate has to be, say, 98 percent, we don't have a scientific basis for saying that that leads to a certain level of comprehension without the research. Am I right?
>
> A. Yes.
>
> Q. So we don't have research saying that there needs to be a certain percentage level of accuracy? And if I understand it correctly, you didn't test these individual plaintiffs to see what their comprehension was of what was going on in the games. Am I right?
>
> A. That's right.
>
> Q. So we don't have empirical data from the plaintiffs themselves, correct?
>
> A. Correct.
>
> Q. And we don't have generalized research that has already been published in peer-reviewed literature. Am I right?
>
> A. I believe so.

*Id.* at 55:3-56:3.

Ms. York is not qualified to render the opinions she has been retained to present. Furthermore, even if she were, her opinions lack the necessary indicia of reliability required by Federal Rule of Evidence 702. Accordingly, and as set forth in more detail below, Ms. York's testimony should be excluded for purposes of summary judgment and trial.

## ARGUMENT

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, *if (1) the testimony is based upon sufficient facts or data*, (2) the testimony is the *product of reliable principles and methods*, and (3) the *witness has applied the principles and methods reliably to the facts of the case*.

Fed. R. Evid. 702 (emphasis added).

The Supreme Court, in discussing the requirements of Rule 702, "has emphasized that federal judges bear a 'gatekeeping responsibility' to ensure that admitted testimony is both relevant and reliable." *Higgins v. Diversey Corp.*, 998 F. Supp. 598 (D. Md. 1997) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 n. 7 (1993)). This "gatekeeping responsibility" applies not only to "scientific" testimony, but to all expert testimony. *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp.2d 378, 391 (D. Md. 2001) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)). "Parties have every incentive to hire 'outlier' experts with sincere but extreme views so long as they can conceal the outlier status." David E. Bernstein, *Frye, Frye Again: The Past, Present, and Future of the General Acceptance Test,* 2 Bureau of National Affairs Expert Evidence Report (Feb. 18, 2002). Rule

702, properly applied, acts as a bulwark against the "concealed outlier" and the distorted results that would be triggered by acceptance of their unreliable testimony.

"*Kumho Tire* emphasizes that the purpose of Rule 702's gatekeeping function is to 'make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 203 (4th Cir. 2001) (*citing Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Furthermore, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire*, 526 U.S. at 157 (*quoting Joiner*, 522 U.S. at 146). "A reliable expert opinion must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. General Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999). *See also Kumho Tire*, 526 U.S. at 157 (stating that "nothing in *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert") (internal quotation marks omitted) (quoting *General Elec. v. Joiner*, 522 U.S. 136, 146 (1997)). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Elec. v. Joiner*, 522 U.S. 136, 146 (1997).

### A. Ms. York Is Not Qualified To Render An Expert Opinion In This Matter.

To qualify as an expert under Rule 702, a witness must have "knowledge, skill, experience, training, or education" in the subject area in which he intends to testify. Fed. R. Evid. 702. In assessing the admissibility of an expert's opinion, the court must keep in mind

that "given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999).

"[T]here are many different kinds of experts, and many different kinds of expertise." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001) (citing *Kumho Tire*, 526 U.S. at 150). To be of value, the person offering testimony, "must possess 'some special skill, knowledge or experience' … concerning the particular issue before the court." *Id*. (internal citations omitted). *See also Oglesby v. General Motors Corp.*, 190 F.3d 244, 247 (4th Cir. 1999) (testimony of mechanical engineer excluded because no specialized experience or expertise in evaluating either automobile manufacturing processes or the strength of plastic automobile component parts); *Ancho v. Pentek Corp.*, 157 F.3d 512, 517 (7th Cir. 1998) (mechanical engineer with no experience designing or evaluating factories not an expert on industrial plant configuration); *Silva v. American Airlines, Inc.*, 960 F. Supp. 528, 531 (D. P.R. 1997) (civil engineer with public works experience could not testify about safety aspects of aircraft design about which he had no professional experience).

"While the fit between an expert's specialized knowledge and experience and the issues before the court need not be exact, … an expert's opinion is helpful to the trier of fact, and therefore relevant under Rule 702, 'only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion; the opinion must be an expert opinion (that is, an opinion informed by the witness' expertise) rather than simply an opinion broached by a purported expert.'" *Shreve*, 166 F. Supp.2d at 392-93. *Daubert* and *Kumho Tire* make clear that this Court's "gatekeeping inquiry must be 'tied to the facts' and issues

of th[is] particular 'case.'" *Id*. (citing *Kumho Tire*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 591)). Accordingly, a marketing professional such as Ms. York must be found to possess some "special skill, knowledge or experience" with respect to the issues that are before this Court before she can be allowed to testify. *Shreve*, 166 F. Supp.2d at 392.

Plaintiffs seek to have Ms. York testify as an expert in captioning and the accuracy of captioning. However, applying the above principles to the case at hand, it becomes clear that Ms. York is not qualified to render these opinions.

As her deposition testimony illustrates, she has no formal training in any subject that would enable her to impart any specialized knowledge to the jury. Ms. York is simply an English major and a marketing professional for the captioning industry. She may be very good at sales and marketing, but this is not a case about sales and marketing. She has not performed any research or published any scholarly articles on the subject of captioning. The analysis she purported to perform of captioning provided by the University of Maryland was simple arithmetic ("counting the words spoken, subtracting the errors, divided by the words written"), and could be performed by any layperson. *Id*. at 50:21-51:1, 54:6-7. She has no training, education or experience that enables her to correlate captioning accuracy with actual comprehension and, indeed, she professes no interest in the subject. Simply stated, her qualifications fall far short of what is required under Fed. R. Evid. 702.

**B. Ms. York's Opinion That The Captioning Provided By The University Of Maryland Is Insufficiently Accurate Is Inadmissible As It Is Not The Product Of Scientific, Technical, Or Other Specialized Knowledge.**

Even if this Court concludes that Ms. York is qualified to render expert opinion testimony concerning captioning, Plaintiffs have nonetheless failed to establish that her

opinions are sufficiently reliable under Rule 702. In order "to satisfy this standard of 'evidentiary reliability,'" Plaintiffs must demonstrate that Ms. York's "expert testimony is 'grounded in the methods and procedures ... [and] supported by appropriate validation – *i.e.*, good grounds, based on what is known.'" *Higgins v. Diversey Corp.*, 998 F. Supp. 598, 602 (D. Md. 1997) (citing *Daubert*, 509 U.S. at 590).[1] "[C]onjecture, hypothesis, 'subjective belief, or unsupported speculation' are impermissible bases for expert opinion and must be discarded." *Cavallo v. Star Enter.*, 892 F. Supp. 756, 761 (E.D. Va. 1995), *aff'd on these grounds*, 100 F.3d 1150 (4th Cir. 1996) (quoting *Daubert*, 509 U.S. at 590).

Plaintiffs cannot satisfy these foundational requirements. Indeed, Ms. York is unabashedly determined to offer her "subjective belief" in the guise of expert testimony. Her opinion regarding the quality and the accuracy of the captioning does not involve special or scientific knowledge. Her conclusion regarding the measured accuracy of the University's captioning was arrived at through a simple arithmetic calculation that the Plaintiffs themselves could have performed competently. The Plaintiffs can readily testify regarding their experiences with the University's present captioning system and their perceptions of its accuracy and effectiveness.

Her opinion that captioning must meet a 98 percent accuracy level is not based on any

---

[1] *Daubert* identifies four non-exhaustive factors that a court may consider in determining whether to admit an expert opinion as reliable, including (1) whether a "theory or technique … can be (and has been) tested"; (2) whether it "has been subjected to peer review and publication"; (3) whether, with respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Kumho Tire*, 526 U.S. at 149-50 (quoting *Daubert*, 509 U.S. at 592-94.

scientific, or other, specialized knowledge regarding the correlation of this accuracy level and "effective communication". She cites no research supporting this number. In fact, Ms. York emphasized that she was not concerned with the level of actual comprehension. She deemed this irrelevant. In her view, captioning "should be verbatim, [] deaf people should see a representation of exactly what is spoken." *Id*. at 67:18-20. In other words, her testimony would not address the subject of effective communication based on neutral principles derived from research or specialized experience. Instead, she would offer pure advocacy of a personal view about what is desirable.

Ms. York's opinions, premised on her faulty, unsupported conclusions that are not grounded in any peer reviewed research, do not display the intellectual rigor demanded by the Supreme Court. Her testimony would "amount[] to a wholly conclusory finding based upon her subjective beliefs rather than any valid scientific method." *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 200 (4th Cir. 2001). Where an expert opinion "appears to be based more on supposition than science," as here, the court is within its discretion to exclude that evidence. *O'Neill v. Windshire-Copeland Assocs., L.P.*, 372 F.3d 281, 285 (4th Cir. 2004); *see also Cooper*, 259 F.3d at 203 (district court properly excluded evidence where expert's "insufficient" methodology rendered opinion "little more than speculation"). Ms. York's opinions are unsupported and unreliable. Accordingly, the court must exclude them as *ipse dixit* evidence.

**CONCLUSION**

Therefore, as Ms. York's opinion is unreliable under Fed. R. Evid. 702, Defendants request that the Court exclude her testimony from its consideration of the parties'

cross-motions for summary judgment and from any trial of this matter.

Respectfully submitted,

DOUGLAS F. GANSLER
Attorney General of Maryland

/s/

Paul D. Raschke, Bar No. 03428
Stephanie Shea, Bar No. 28987
Assistant Attorney General
Office of the Attorney General
Educational Affairs Division
200 Saint Paul Place, 17th Floor
Baltimore, Maryland 21202
(410) 576-6316
(410) 576-6437(fax)
praschke@oag.state.md.us
sshea@oag.state.md.us

*Attorneys for Defendants*

Dated: July 1, 2014