IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| | : | |
| JOSEPH INNES, et al. | | |
| | : | |
| v. | : | Civil Action No. DKC 13-2800 |
| | : | |
| THE BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF MARYLAND, et al. | : | |
| | : | |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this disability discrimination case is the motion to dismiss Plaintiffs' second amended complaint, filed by Defendants Board of Regents of the University System of Maryland ("the Board of Regents), the University of Maryland College Park ("the University of Maryland"), and Wallace D. Loh ("President Loh" or "Dr. Loh"). (ECF No. 34). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to dismiss will be granted in part and denied in part.

## I. Background[1]

Plaintiffs Dr. Joseph Innes ("Dr. Innes"), Daniel Rinas ("Mr. Rinas") and Sean Markel ("Mr. Markel") are deaf. They

---

[1] The facts are drawn from the second amended complaint. (ECF No. 33).

regularly attend sporting events – including football and basketball games – at the Capital One Field at Byrd Stadium ("Byrd Stadium") and the Comcast Center.  (ECF No. 33 ¶¶ 2-4). The Board of Regents is the governing body for all University of Maryland campuses, of which the University of Maryland, College Park is the "flagship" campus.  (*Id.* ¶ 5).  Plaintiffs assert that Byrd Stadium and the Comcast Center are located on the University of Maryland's main campus in College Park.  (*Id.* ¶ 10).  Dr. Wallace Loh is the President of the University of Maryland.  All three Plaintiffs also regularly access Defendants' athletics website – TerpsTV – and attempt to watch videos on this website.  (*Id.* ¶ 12).  The website contains videos presented with speaking individuals discussing game highlights and interviews with players.  (*Id.* ¶ 16).  The narrated web content also includes complete games for some teams.  For instance, Plaintiffs assert that during the week of October 4, 2013, TerpsTV streamed a women's soccer game against North Carolina State with audio commentary by two individuals. On October 12, 2013 TerpsTV streamed audio commentary for a live football game.  (*Id.* ¶ 17).  None of the audio was captioned.

Defendants' venues at Byrd Stadium and the Comcast Center have public address systems and other systems in the stadium bowls and concourse areas that project information aurally, including referee calls, play-by-play commentary, song lyrics,

2

and safety and emergency information. (*Id.* ¶ 13). Plaintiffs cannot hear these announcements. Plaintiffs also cannot hear the aural content on Defendants' website. (*Id.* ¶ 14). Defendants' venues also have visible electronic scoreboards and ribbon boards, and the Comcast Center has a four-sided visual display hanging over center court, which Plaintiffs believe to be a Sony Jumbotron. (*Id.* ¶ 15). Plaintiffs assert that captioning can be – but is not – displayed on Jumbotrons, LED ribbon boards, and scoreboards located throughout Defendants' venues. (*Id.* ¶ 20). Plaintiffs state that "[t]hrough captioning, spoken and other auditory/aural information is made accessible to individuals who are deaf or hard of hearing." (*Id.* ¶ 19). Captioning can also be placed on video displayed on the University of Maryland athletic websites. Plaintiffs assert that Defendants do *not* display captioning on Jumbotrons, LED ribbon boards, or scoreboards, nor is streaming web content captioned. (*Id.* ¶¶ 16, 22).

Dr. Innes contacted the University of Maryland "Terrapin Club" on numerous occasions, including prior to 2007, to request that Defendants provide captioning for football and basketball games. (*Id.* ¶ 25). Defendants renovated Byrd Stadium in 2007, but, despite repeated requests from Dr. Innes, did not upgrade the scoreboards to provide captioning for referee calls, play-by-play commentary, song lyrics, safety and emergency

information, half-time entertainment, post-game conferences, or any other aural information projected into the stadium bowls or concourse areas before, during, or after the games. (*Id.* ¶ 27). On February 18, 2013, Plaintiffs sent a letter to Defendants again requesting captions for announcements made on public address systems, the scoreboards, LED ribbon boards, and/or Jumbotron at Byrd Stadium and the Comcast Center and for those captions to be visible from all seats in each venue. (*Id.* ¶ 28).

Plaintiffs contend that Defendants started to provide captioning at some point during the 2013-2014 football season at Byrd Stadium "by providing captions that are supposed to be accessible on smart phones or tablet devices." (*Id.* ¶ 29). Plaintiffs assert that captioning on hand-held device or tablets does not provide effective communication. Specifically, Plaintiffs assert that individuals who are deaf and who communicate through the use of American Sign Language ("ASL") must use their hands to speak. Plaintiffs argue:

> [t]hey are, therefore, unable to speak with anyone while holding a device on which they would read captions. Thus, unlike hearing fans, deaf fans would not be able to comment to one another about the progress of a game. Also unlike hearing fans deaf fans would be unable to hold a snack and drink while reading captions. On information and belief, there are no cupholders or other stands on which to place food and beverages in the seating bowl of Byrd Stadium.

(*Id.* ¶ 30).  Plaintiffs also maintain that many smart phone and tablet devices cannot be read in bright sunlight, thus deaf individuals would not be able to read captions if football games are played on sunny days.  (*Id.* ¶ 31).  Streaming captions from a website to a smart phone or tablet requires a strong, uninterrupted internet signal; "[t]he proximity of thousands of other fans using the internet on their smart phones and/or tablets during a football or basketball game weakens and interrupts the signal so that the captions do not appear on the devices in a timely fashion." (*Id.* ¶ 33).  Plaintiffs maintain that the communication provided by a tablet or handheld device is not timely and does not ensure that deaf or hard of hearing fans have equal access to games.  Moreover, "[u]se of hand-held devices for captions would prevent deaf fans from observing what is being projected on a video board of Jumbotron while reading what the stadium announcer is saying." (*Id.* ¶ 36).  Plaintiffs aver that use of hand-held devices also would require "difficult visual adjustments between observing live action at a distance and close vision for reading captions on a small screen." (*Id.*).

As an example of the shortcomings with using hand-held devices for captioning, Plaintiffs refer to an October 12, 2013 football game, which Dr. Innes and a number of deaf friends

attended at the University of Maryland.  Dr. Innes asserts that he went to fan assistance and asked for information about how to read captions on the handheld device.  According to Dr. Innes, he "was given a note that said the web site was not working and captions would be unavailable."  (*Id.* ¶ 34).  Dr. Innes asserts that the individual who wrote the note never informed him about whether the site began to operate, although she said that she would.

Plaintiffs filed a complaint against the University of Maryland, the Board of Regents, and President Loh, in his official capacity, on September 24, 2013.  (ECF No. 1). Plaintiffs later amended the complaint on October 16, 2013. (ECF No. 6).  The University of Maryland answered the complaint on October 30, 2013 (ECF No. 8), and simultaneously joined in a motion to dismiss filed by the Board of Regents and President Loh (ECF No. 9).  Plaintiffs filed an unopposed motion to file a second amended complaint, which the undersigned granted.  (ECF No. 32).  Plaintiffs submitted a second amended complaint against all Defendants on January 8, 2014.  (ECF No. 33). Plaintiffs' second amended complaint asserts two claims against all Defendants: (1) discrimination under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131; and (2) discrimination under the Rehabilitation Act, 29 U.S.C. § 504.  (ECF No. 33, at 8-10).  Plaintiffs assert that Defendants

have failed to provide auxiliary aids and services to ensure effective communication with individuals who are deaf or hard of hearing concerning aural information: (1) available on Defendants' athletic websites; and (2) projected into the stadium bowls and concourse areas at Byrd Stadium and the Comcast Center. (*Id.* at 9-10). Plaintiffs seek compensatory damages, declaratory judgment, injunctive relief, and "all other and further relief as this Court may deem just and proper." (*Id.* at 10-11). Defendants moved to dismiss on January 22, 2014, Plaintiffs opposed the motion, and Defendants replied. (ECF Nos. 34, 38, 39).

## II. Standard of Review

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the sufficiency of the complaint. *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006). A plaintiff's complaint need only satisfy the standard of Rule 8(a), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 n.3 (2007). That showing must consist of more than "a formulaic recitation of the elements of a cause of action" or "naked assertion[s] devoid of further

factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted).

At this stage, all well-pleaded allegations in a complaint must be considered as true, *Albright v. Oliver*, 510 U.S. 266, 268 (1994), and all factual allegations must be construed in the light most favorable to the plaintiff, *see Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (*citing Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993)).  In evaluating the complaint, unsupported legal allegations need not be accepted.  *Revene v. Charles Cnty. Comm'rs*, 882 F.2d 870, 873 (4th Cir. 1989).  Legal conclusions couched as factual allegations are insufficient, *Iqbal*, 556 U.S. at 678, as are conclusory factual allegations devoid of any reference to actual events, *United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979); *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but it has not 'show[n] . . . that the pleader is entitled to relief.'"  *Iqbal*, 556 U.S. at 679 (*quoting* Fed.R.Civ.P. 8(a)(2)).  Thus, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.*

## III. Analysis

### A.   Statute of Limitations[2]

Defendants argue that Plaintiffs' claims concerning Byrd Stadium and the Comcast Center are time-barred. (ECF No. 34-1, at 16).[3]   The ADA and Rehabilitation Act do not specify a limitation period.   Thus, courts "borrow" the most appropriate or analogous state statute of limitations and apply it to the federal cause of action.   *See A Soc'y Without A Name v. Virginia*, 655 F.3d 342, 347 (4th Cir. 2011), *cert. denied*, 132 S.Ct. 1960 (2012).   "Maryland courts apply the three-year limitations period governing general civil actions to ADA and Rehabilitation Act claims." *Jeandron v. Bd. of Regents of Univ. Sys. Of Md.*, 510 F.App'x 223, 226 (4th Cir. 2013) (citations

---

[2]   A motion to dismiss filed under Fed.R.Civ.P. 12(b)(6) generally cannot reach the merits of an affirmative defense, such as the defense that the claim is time-barred. *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007). "But in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Id.* As the Fourth Circuit noted, however, "[t]his principle only applies, [], if all facts necessary to the affirmative defense clearly appear[] *on the face of the complaint*." *Id.* (internal citations omitted) (emphasis in original).   Although Plaintiffs believe that some of Defendants' arguments in the motion to dismiss constitute affirmative defenses inappropriate to consider on a motion to dismiss, Plaintiffs do not make this argument with respect to the statute of limitations defense.

[3]   As Plaintiffs point out, Defendants do *not* argue that the statute of limitations has expired with respect to Plaintiffs' claims that the athletic websites are inaccessible to deaf people. (ECF No. 38, at 27 n.8).

omitted); *see also Speciner v. NationsBank, N.A.*, 215 F.Supp.2d 622, 634 (D.Md. 2008) (determining that "the three year limitations period applicable to state law civil actions is the most appropriate in the context of an ADA civil rights claim"); *Schalk v. Associated Anesthesiology Practice*, 316 F.Supp.2d 244, 251 (D.Md. 2004) (holding that "the statute of limitations for Rehabilitation Act claims in Maryland is three years").

The parties disagree as to when a cause of action under the Rehabilitation Act and the ADA accrues. Defendants view this dispute as an architectural barrier case and argue that the statute of limitations begins to run upon completion of the structure or completion of its most recent and relevant alteration. Defendants believe that Plaintiffs have known – or as regular patrons of the University's facilities, should have known – "since 2007 and 2002 respectively, that [Byrd Stadium and the Comcast Center] did not have the 'line-of-sight' and 'hands-free' display of information they now demand." (ECF No. 34-1, at 17). Thus, Defendants believe that to be considered timely, Plaintiffs needed to have filed their action by 2005 (as to the Comcast Center) and 2010 (as to Byrd Stadium). Plaintiffs did not file the complaint until September 2013. Contrary to Defendants' assertions, Plaintiffs are not alleging that they are unable to access the athletic facilities at Byrd Stadium or the Comcast Center, nor are they necessarily arguing

10

that architectural barriers preclude their participation in the programs and activities at the University of Maryland.  Instead, Plaintiffs assert that "Defendants have failed to provide auxiliary aids and services to ensure *effective communication* with individuals who are deaf or hard of hearing, such as Plaintiffs, with respect to aural information" projected at Byrd Stadium and the Comcast Center.  (ECF No. 33 ¶¶ 41, 42, 47, 48) (emphasis added).  The gravamen of Plaintiffs' complaint is that Defendants fail to provide effective communication for deaf fans at athletic events and on the University of Maryland's athletic websites.  Plaintiffs assert that Defendants continue to repeat the same violation that denies Plaintiffs meaningful access to Defendants' programs, services and activities.  Thus, Plaintiffs maintain that the statute of limitations "begins to run anew each and every time Plaintiffs attend a football or basketball game at Byrd Stadium or Comcast Center and Defendants fail to provide the auxiliary aids and services necessary to ensure effective communication for the Plaintiffs."  (ECF No. 28, at 27).

Title II imposes an affirmative obligation to make "reasonable modifications to rules, policies, or practices, the removal of architectural, *communication*, or transportation barriers, or the provision of auxiliary aids and services" to enable disabled persons to receive services or participate in

11

programs or activities.   42 U.S.C. § 12131(2) (emphasis added).
Here, Plaintiffs assert communication barriers to their
participation in athletic events held at the University of
Maryland.  "In general, to establish a continuing violation the
plaintiff must establish that the unconstitutional or illegal
act was a . . . fixed and continuing practice."  *Nat'l Adver.
Co. v. City of Raleigh*, 947 F.2d 1158, 1166 (4th Cir. 1991)
(internal citations omitted).  "[I]f the plaintiff can show that
the illegal act did not occur just once, but rather 'in a series
of separate acts[,] and if the same alleged violation was
committed at the time of each act, then the limitations period
begins anew with each violation.'"  *A Soc'y Without A Name*, 655
F.3d at 348 (*quoting Nat'l Adver. Co.*, 947 F.2d at 1167).
Continuing unlawful acts are distinguishable from the continuing
ill effects of an original violation because the latter does not
constitute a continuing violation.  *Id.*

Here, Plaintiffs assert that every time they attend
athletic events at Byrd Stadium or the Comcast Center,
Defendants fail to provide the auxiliary aids and services
necessary to ensure effective communication for the Plaintiffs.
Consequently, Plaintiffs assert that they are unable to hear any
of the aural information projected into the stadium bowl, arena,
and concourse areas every time they attend athletic events at
Byrd Stadium and the Comcast Center, and - unlike individuals

who are not deaf or hard of hearing – are denied the benefits of participating in such events.   Plaintiffs assert that the violation did not happen only once; according to Plaintiffs, Defendants regularly fail to provide them with effective communication during athletic events.   For instance, Dr. Innes cites an incident on October 12, 2013, when captions on his handheld device were unavailable during a game.   (ECF No. 33 ¶ 34).

The analysis in *Mosier v. Kentucky*, 675 F.Supp.2d 693, 697 (E.D.Ky. 2009) – although not binding on this court – is instructive.   That case involved a disability discrimination claim by a deaf attorney who argued that she was unable to participate fully in court proceedings without appropriate auxiliary aids or services, such as a sign language interpreter. Defendant in that case argued that the Court Interpreting Services Division of the Administrative Office of the Courts had a policy that it did not provide interpreting services for attorneys.   *Mosier*, 675 F.Supp.2d at 695.   Defendants in *Mosier* argued that plaintiff's claims were time-barred because her claims accrued in 2004, when defendants implemented the court interpreting services program that provided interpreters for only parties, jurors and witnesses.   The court rejected this argument, reasoning:

> Defendants argue that Plaintiff's claims accrued in 2004 when the interpreter policy was enacted. Citing *Frame v. City of Arlington*, 575 F.3d 432 (5th Cir. 2009), they urge the Court to adopt a policy that the claim accrues when the service, program or activity is made available to the public, such as when construction of a public facility is complete. *Frame*, however, was a facility accessibility claim, not a service accessibility claim. There, the construction of the sidewalk was the government service at issue and the lack of an interpreter is the barrier to Plaintiff's access to that service. *Such service access requirement, unlike facility access requirements, continue[s] to apply even after a service, program or activity has been made available to the public.* To find otherwise would destroy the requirement that governments provide persons with disabilities "meaningful access" to such services. *See Alexander v. Choate*, 469 U.S. 287, 301 (1985).

*Mosier*, 675 F.Supp.2d at 698 (emphasis added).  The same logic applies here.  Much like defendants in *Mosier*, Defendants here argue that the claim accrued when Byrd Stadium was last renovated in 2007 and when Comcast Center was constructed in 2002.  But as in *Mosier*, the lack of effective communication – and not the construction of the respective facility - is the barrier to Plaintiffs' participation in the athletic events.  *Mosier* concluded:

> Governments continue to discriminate against persons with disabilities by providing court proceedings without interpreters or auxiliary aids. Therefore, so long as Plaintiff is denied meaningful access to

> Defendants' programs, the violation of the
> ADA continues.

*Id.*  Similarly, the allegations in the second amended complaint suggest that Defendants' acts – which Plaintiffs believe constitute violations of the ADA and Rehabilitation Act - are recurring.  Accordingly, Defendants have not shown as a matter of law that Plaintiffs' disability discrimination claims concerning Byrd Stadium and the Comcast Center are time-barred.

**B.  Claims against President Loh and the Board of Regents**

Defendants argue that the ADA and Rehabilitation Act claims against President Loh and the Board of Regents should be dismissed as redundant.  President Loh has been sued in his official capacity.  Defendants contend that the ADA and Rehabilitation Act claims against President Loh must be dismissed because it is possible to sue the University of Maryland directly, which Plaintiffs have done.  "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," and "[a]s such, *it is no different from a suit against the State itself*."  *Will v. Mich. Dep't. of State Police*, 491 U.S. 58, 71 (1989) (citations omitted) (emphasis added).  In *Adams v. Montgomery College (Rockville)*, 834 F.Supp.2d 386, 396 (D.Md. 2011), the undersigned held: "[p]laintiff states a valid cause of action under the ADA

against the College.   There is thus no need to pursue a claim against Defendant[s] Brown and Hayer in their official capacities."   The same logic applies here.   Plaintiffs assert that "President Loh is a necessary defendant because, as the university's chief executive officer, he has the power to carry out any injunctive relief that the Court may order." (ECF No. 38, at 37).   Plaintiffs further argue that President Loh is not redundant as a defendant for the additional reason that the University of Maryland has raised the defense of immunity in its answer to the second amended complaint; thus, it is proper to name the relevant state official to obtain relief to the extent the University of Maryland attempts to raise sovereign immunity. (*Id.* at 38).

A lawsuit against President Loh in his official capacity is in essence a lawsuit against the University of Maryland. President Loh and the University of Maryland are one and the same for purposes of this lawsuit.   Without the University of Maryland as a party to the litigation, President Loh would not be in a position to provide any sort of relief because he has been named as a defendant in his official capacity.   *See, e.g., Munoz v. Balt. Cnty., Md.*, Civil Action No. RDB-11-02693, 2012 WL 3038602, at *5 (D.Md. July 25, 2012) (dismissing plaintiff's ADA and Rehabilitation Act claims against each individual defendant in his official capacity because "[p]laintiff has

filed claims against Baltimore County, [thus] his claims against the individual supervisors employed by the County in their official capacities are redundant."); *Harrison-Khatana v. Cannon*, Civil Action No. DKC 11-3715, 2012 WL 5383314, at *2 (D.Md. Oct. 31, 2012) ("[b]ecause Harrison-Kathana is also pursuing relief against WMATA under . . . the ADA, any claims against Cannon in his official capacity would subject to dismissal as redundant."); *Bradley v. Balt. Police Dep't*, Civ. No. JKB-11-1799, 2012 WL 4321738, at *2 (D.Md. Sept. 19, 2012) (dismissing claims against individual defendants because "it would be pointless to [sue them in their official capacities] since a suit brought in that manner would still be, in effect, a suit against the Baltimore Police Department, which is already a defendant."). Accordingly, President Loh will be dismissed as a defendant.

The claims against the Board of Regents, however, require a different conclusion. Defendants argue that the lawsuit against the Board of Regents is redundant because, like the University of Maryland, it is a state entity; thus, a suit against either is a suit against the State. (ECF No. 34-1, at 24). Defendants do not cite any case-law to support dismissal of the Board of Regents on redundancy grounds. Alternatively, Defendants contend that the Board of Regents lacks the statutory duty or authority to provide Plaintiffs' requested relief.

Specifically,    Defendants    argue    that    the    second    amended
complaint:

> does not allege any conduct by the Board of
> Regents that caused the Plaintiffs' alleged
> injuries, does not identify any statutory
> authority of the Board of Regents over
> athletic events at the University, and does
> not identify any duty of the Board of
> Regents to provide auxiliary aids and
> services at athletic events at the
> University or on the University's Athletic
> Department website.

(ECF No. 34-1, at 18). According to Md. Code Ann., Educ. § 12-
102, the University System of Maryland is an "instrumentality"
of Maryland and an "independent unit of State government."  The
government of the University System of Maryland is vested in the
Board of Regents of the University System of Maryland.  *Id.* §
12-102(b).   The Board of Regents "[i]s responsible for the
management of the University System of Maryland and has all the
powers, rights, and privileges that go with that
responsibility."  *Id.* § 12-104(c)(1).   Section 12-104(k)(1)(i)
states that the Board of Regents:

> shall delegate to the president of each
> constituent institution authority needed to
> manage that institution, including authority
> to make and implement policies promoting the
> mission of that institution, including the
> authority to establish policies appropriate
> to the institution's mission, size, location
> and financial resources.

Defendants argue that the Board of Regents should be dismissed
from this lawsuit because the statute "plainly intends to remove

the Board of Regents from the day-to-day operations and hands-on, detailed management of the innumerable aspects involved in running the many schools within the university system." (ECF No. 39, at 9). But as Plaintiffs point out, the Board of Regents has ultimate control over the University of Maryland. Defendants are correct that the Board of Regents can delegate authority to the presidents of the various universities it oversees, but, as an example of how the Board of Regents retains ultimate control, "[a]ny delegation of authority may be modified or rescinded by the Board of Regents at any time in whole or in part." Md. Code Ann., Educ. § 12-104(k)(2). Moreover, the Board of Regents maintains responsibility to develop policies and guidelines that "[p]rovide direction to the presidents of the constituent institutions on compliance with applicable law and policy," which presumably includes disabilities laws. *Id.* § 12-104(k)(3)(i). Although each president shall "[r]egulate and administer athletic and student activities," this responsibility remains [s]ubject to the authority and applicable regulations and policies of the Board of Regents." *Id.* § 12-109(e)(12). Similarly, Section 12-109(d)(2) states that the president of each constituent institution shall "[b]e responsible and *accountable to the Board* for the discipline and successful conduct of the institution and supervision of each of its departments." (emphasis added). These provisions undercut

19

Defendants' arguments that "oversight and management of the operations of the University, including regulation and administration of its athletic events is not within the statutory authority of the Board of Regents." (ECF No. 34-1, at 21). Although the Board of Regents delegated authority to the president of the University of Maryland, it retains ultimate control over the University. Moreover, Section 12-104(b)(3) states that the Board of Regents may "sue and be sued." *Id.* § 12-104(b)(3).

Indeed, courts in this district have rejected similar arguments to those Defendants proffer concerning dismissal of the Board of Regents. In *Jean v. Bd. of Regents of Univ. Sys. of Md.*, Civ. WDQ-13-0117, 2013 WL 3873948, at *2 (D.Md. July 24, 2013), a case involving alleged violations of the ADA and the Rehabilitation Act, the Board of Regents also argued that it lacked the power to take action and was not a proper defendant. Judge Quarles stated that "[a]lthough the Board's management of [University of Maryland Baltimore County ("UMBC")] has been delegated to Hrabowski [UMBC's president] by statute, *see* Md. Code Ann., Educ. § 12-104(k)(1), the statute is equally clear that the Board retains ultimate responsibility for the entire University System." *Id.* at *2. Judge Quarles denied the Board's motion to dismiss, holding that "[c]ombined with the Board's capacity to 'sue and be sued,' [], these provisions

indicate that the Board is a proper defendant in this case."[4]
*See also Pavlovic v. Univ. of Md. Balt. Cnty.*, Civil Action No.
MJG-13-983, 2013 WL 4775530, at *4 (D.Md. Sept. 4, 2013) ("this
Court finds Judge Quarles' decision persuasive and holds that
the [p]laintiffs are not statutorily barred from proceeding on
their claims against the Board."). Accordingly, Plaintiffs'
claims against the Board of Regents will not be dismissed at
this time.

### C.   Claims under the ADA and the Rehabilitation Act[5]

Defendants argue that Plaintiffs' Rehabilitation Act and
ADA claims with respect to Byrd Stadium and the Comcast Center

---

[4] Citing *Stern v. Bd. of Regents*, 380 Md. 691 (2004) and *Bd. of Trustees v. John K. Ruff, Inc.*, 278 Md. 580 (1976), Defendants also argue that the "sue and be sued" language in Section 12-104(b)(3) does not impose unqualified liability upon a government agency; "[r]ather, such liability is limited to suits regarding matters within the agency's specific powers and obligations." (ECF No. 34-1, at 21). Judge Quarles rejected this argument in *Jean*, 2013 WL 3873948, at *2 n.6. As he noted, these cases concern sovereign immunity. Much like the Board in *Jean*, the Board of Regents here has not claimed sovereign or Eleventh Amendment immunity. Moreover, as Plaintiffs point out, Congress has abrogated Maryland's sovereign immunity for Title II claims. *See Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). Acceptance of federal funds under the Rehabilitation Act abrogates Eleventh Amendment immunity. *Id.* at 498.

[5] Claims under Title II of the ADA and the Rehabilitation Act can be combined for analytical purposes because the analysis is "substantially the same." *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 n.9 (4th Cir. 1995); *Rogers v. Dep't of Health & Environmental Control*, 174 F.3d 431, 433-34 (4th Cir. 1999) (stating that courts may apply Rehabilitation Act precedent in interpreting the ADA, and vice versa).

must be dismissed for failure to state a claim.[6]  Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132. "Discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."  42 U.S.C. § 12112(b)(5)(A); *see also Paulone v. City of Frederick*, 787 F.Supp.2d 360, 372 (D.Md. 2011) (discussing the equivalence of "reasonable accommodations" and "reasonable modifications"). Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  A plaintiff seeking recovery for violation of either the ADA or the Rehabilitation Act must allege that: (1) he has a disability, (2) he is otherwise qualified to receive the

---

[6] Defendants do *not* argue that Plaintiffs' Rehabilitation Act and ADA claims should be dismissed for failure to state a claim with respect to captioning on Defendants' athletic website.

benefits of a public service, program, or activity, and (3) he was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of his disability. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).[7]

Defendants do not contest that Plaintiffs, who are deaf, are disabled within the meaning of the first prong. Defendants also concede that Plaintiffs are qualified to receive the benefits of a public service, program or activity. The University of Maryland and the Board of Regents also do not contest that they are recipients of federal funding for purposes of the Rehabilitation Act. Defendants maintain, however, that Plaintiffs fail to allege sufficient facts to satisfy the third prong: "the unembellished language of their complaint establishes that the only accommodation they will accept, the retrofitting by a public entity of a facility, simply is not mandated by Title II." (ECF No. 34-1, at 10). As stated, to establish the third prong of a disability discrimination claim, a plaintiff must show that he was excluded from participation in, or denied the benefits of, a program or service offered by a

---

[7] Under Title II, a plaintiff need only show discrimination "by reason of" disability. 42 U.S.C. § 12132. But, a successful Rehabilitation Act claim requires a showing of discrimination "*solely* by reason of" disability. 29 U.S.C. § 794(a) (emphasis added).

public entity, or subjected to discrimination by that entity. *See Constantine*, 411 F.3d at 499. The Fourth Circuit has recognized "three distinct grounds for relief: (1) intentional discrimination or disparate treatment; (2) disparate impact; and (3) failure to make reasonable accommodations." *A Helping Hand, LLC v. Balt. Cnty., Md.*, 515 F.3d 356, 362 (4th Cir. 2008). Plaintiffs invoke the third ground. The second amended complaint states:

> Because Plaintiffs are unable to hear any of the aural information projected into the stadium bowl, arena, and concourse areas, or played on Defendants' web site, Plaintiffs do not have equal opportunity to enjoy, benefit from, or participate in home games, athletic events, or public web sites equal to that of individuals without disabilities.

(ECF No. 33 ¶ 24).

Defendants argue that they have offered reasonable accommodation by providing captioning that is supposed to be accessible on hand-held devices, such as smart phones or tablet devices. (ECF No. 33 ¶ 29).[8] Defendants assert that "Plaintiffs' complaint explicitly rejects the provision or use of handheld devices as 'auxiliary aids' as a reasonable accommodation. Instead, they demand architectural modifications to the Jumbotrons and scoreboards." (ECF No. 34-1, at 11).

---

[8] The second amended complaint states that "Defendants claimed for the first time that they had begun providing captioning at some point during the 2013-2014 football season at Byrd Stadium." (ECF No. 33 ¶ 29).

Defendants assert that the ADA Accessibility Guidelines do not require them to provide captioning in the form Plaintiffs request. They state that "both with respect to structures built prior to the adoption of the ADA and for those that have been modified thereafter, there is no legal requirement that the facilities provide 'line-of-sight' and 'hands-free' live captioning for the deaf." (ECF No. 34-1, at 14). Defendants contend that Plaintiffs seek to dictate a particular form of accommodation, "one that can only be achieved through extensive retrofitting of the University's facilities to incorporate the most recent technological developments. This goes well beyond the requirements of Title II." (*Id.* at 15).

Plaintiffs aver that "[c]aptioning can be displayed on Jumbotrons, LED ribbon boards, and scoreboards located through the venues." (ECF No. 33 ¶ 20). Defendants assert that the Jumbotron, scoreboards and control room at Byrd Stadium and the Comcast Center constitute 'facilities' under the ADA. Consequently, as Plaintiffs point out, Defendants' arguments largely center on program accessibility regulations promulgated under the ADA to the exclusion of communication regulations, which Plaintiffs contend apply here.[9]   With regard to

---

[9] Congress directed the Department of Justice to promulgate regulations implementing Title II of the ADA. *See* 42 U.S.C. § 12134(a). The Department of Justice was also directed to issue regulations governing Section 504 of the Rehabilitation Act "for

communication-related disabilities, the regulations require public entities to "take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities *are as effective as communications with others*," 28 C.F.R. § 35.160(a) (emphasis added), and to "furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity." *Id.* § 36.160(b)(1).[10] "Auxiliary aids and services" are defined by both statute and regulation. *See* 42 U.S.C. § 12103(1); 28 C.F.R. § 35.303. The regulation is more expansive. Examples of auxiliary aids and services include: "open and closed captioning, including real-

the consistent and effective implementation of various laws prohibiting discriminatory practices in Federal programs and programs receiving Federal financial assistance." Executive Order 12250, 45 Fed.Reg. 72995 (Nov. 2, 1980). The regulations governing Title II of the ADA are found at 28 C.F.R. part 35, and the regulations under the Rehabilitation Act for recipients of federal funding are contained in 28 C.F.R. part 42, subpart G.

[10]    Similarly, the regulations interpreting the Rehabilitation Act require that recipients of federal funding "shall insure that communications with their applicants, employees and beneficiaries are effectively conveyed to those having impaired vision and hearing." 28 C.F.R. § 42.503(e). Moreover, a "recipient that employs fifteen or more persons shall provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provisions would discriminatorily impair or exclude the participation of such persons in a program or activities receiving Federal financial assistance." *Id.* § 42.503(f).

time captioning," the "[a]cquisition or modification of equipment or devices," and "[o]ther similar services and actions." 28 C.F.R. § 35.104. The regulation governing effective communication acknowledges that:

> The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place.

28 C.F.R. § 35.160(b)(2). Notably, the regulation further instructs:

> In determining what types of auxiliary aids and services are necessary, *a public entity shall give primary consideration to the requests of individuals with disabilities*.

*Id.* (emphasis added).

Plaintiffs allege in the second amended complaint that the form of auxiliary aid or service that Defendants have offered for Byrd Stadium and the Comcast Center – captioning on hand-held devices – does not provide effective communication. Specifically, Plaintiffs assert that many smart phone and tablet devices cannot be read in bright sunlight, thus precluding deaf patrons from being able to read captions if football games are played on sunny days. (ECF No. 33 ¶ 31). Plaintiffs further explain that deaf fans would be unable to speak to each other using sign language while holding the device on which they would

read captions, and would be unable to hold a snack and a drink while reading captions. (*Id.* ¶ 30). The accommodation Defendants have offered would also require deaf patrons using the hand-held devices to make difficult visual adjustments between observing live action at a distance and close vision for reading captions on a small screen. (*Id.* ¶ 36). Plaintiffs further inform that captions may not be timely due to the likelihood of experiencing interrupted single, given the "proximity of thousands of other fans using the internet on their smart phones and/or tablets during a football or basketball game." (*Id.* ¶ 33). Indeed, Plaintiffs provide an example of when Dr. Innes attended a game on October 12, 2013, was unable to read captions on his device, and was told that the website was not working and captions would be unavailable. (*Id.* ¶ 34).

These allegations challenge the effectiveness of communication accommodations provided by Defendants with respect to Byrd Stadium and the Comcast Center. Defendants respond that Plaintiffs' request that captioning be displayed on Jumbotrons, LED ribbon boards, or scoreboards requires retrofitting of a facility to incorporate the latest technological innovation. (ECF No. 34-1, at 8 n.4). As Plaintiffs point out, however, Title II contemplates that public entities may be required to modify their facilities, including the acquisition or

28

modification of equipment or devices as auxiliary aids and services. (ECF No. 38, at 20-21); *see* 28 C.F.R. §§ 35.104 & 35.130(b)(7). Indeed, applying the program accessibility regulations that Defendants cite – instead of the regulations governing effective communication – also counsels against dismissal of Plaintiffs' second amended complaint. Specifically, 28 C.F.R. § 35.150(b)(1) states that "[a] public entity is not required to make structural changes in existing facilities *where other methods are effective in achieving compliance with this section.*" (emphasis added). Here, Plaintiffs cite several examples, discussed *supra*, to show that the "other methods" of captioning Defendants have offered do *not* yield effective communication. (*See* ECF No. 38, at 24). Plaintiffs assert that unlike hearing fans, when they attend athletic events at Byrd Stadium and the Comcast Center, they "are unable to hear any of the aural information projected into the stadium bowl, arena, and concourse areas." (ECF No. 33 ¶ 24). Thus, Plaintiffs assert that they "do not have equal opportunity to enjoy, benefit from, or participate in home games, athletic events, or public web sites equal to that of the individuals without disabilities." (*Id.*); *see, e.g., Feldman v. Pro Football, Inc.*, 419 F.App'x 381, 391 (4th Cir. Mar. 25, 2011) ("For plaintiffs to enjoy a game on a level as equal as possible with hearing spectators, they must be able to access, in both

the stadium bowl and concourse areas, the game-related information broadcast over the public address system.”). Although Defendants are correct that auxiliary aids and services do not necessarily need to take a particular form in order to constitute effective communication, at this stage, it is inappropriate to resolve factual disputes between the parties regarding whether Defendants’ accommodation provides effective communication.[11]

---

[11] Although Title II of the ADA applies here, Defendants find persuasive DOJ’s decision to decline to impose new requirements under Title III regarding whether captioning should be required in stadiums. Defendants refer to final rules issued by DOJ enforcing the accessibility standards of Title III of the ADA. *See Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities*, 28 C.F.R. § 36. With respect to the issue of captioning of “*all* public address announcements,” rather than simply “safety and emergency information,” DOJ elected to postpone rulemaking on this complex issue. *Id.; see also Feldman*, 419 F.App’x at 392 (discussing DOJ regulations). DOJ concluded “that further consideration and review would be prudent before it issues specific regulatory requirements.” Defendants interpret this decision to mean that captioning need not be provided in stadiums.

In *Feldman*, 419 F.App’x at 392-93, the Fourth Circuit considered – but rejected – a similar argument proffered by defendants. The Fourth Circuit noted that DOJ’s “action demonstrates the DOJ’s alertness to problems like those experienced by plaintiffs. It does not preclude the conclusion that the ADA requires defendants to provide auxiliary access to more than just safety and emergency information.” The same logic applies here. The fact that the regulations are silent regarding the form of relief Plaintiffs request here does not, *ipso facto*, suggest that such accommodations are beyond the scope of accommodations envisioned by Title II or the Rehabilitation Act.

Indeed, although Defendants do not use these words, their argument challenging the accommodations Plaintiffs request amounts to an "undue burden" defense, which is inappropriate to consider at the motion to dismiss stage. 28 C.F.R. § 35.164 states that a public entity need not take any action "that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." "[A] public entity has the burden of proving that compliance with this subpart would result in such alteration or burdens." *Id.* Based on the foregoing, Defendants' motion to dismiss Plaintiffs' Rehabilitation Act and Title II claims concerning effective communication at Byrd Stadium and the Comcast Center will be denied.

**D. Rehabilitation Act**

Defendants also argue that the Section 504 claims must be dismissed because the second amended complaint does not allege that Defendants discriminated against Plaintiffs *solely* because of their disability. (ECF No. 34-1, at 17). Plaintiffs allege that Defendants discriminated against them by failing to provide effective communication for deaf patrons at Byrd Stadium, the Comcast Center, and on University of Maryland's athletic websites. Plaintiffs assert that Defendants' failure to display captions on the Jumbotrons and scoreboards and ribbon boards at Byrd Stadium, the Comcast Center, and the athletic websites

31

results in a lack of reasonable accommodation.  As Plaintiffs point out, the only plausible inference from the allegations in the second amended complaint is that they were discriminated against solely on the basis of their disability.  The analysis in *Mosier*, 675 F.Supp.2d at 698, is again instructive.  In that case, defendants also argued that plaintiff could not meet the "solely" requirement under the Rehabilitation Act.  The case, discussed *supra*, involved a deaf attorney's lawsuit against the Commonwealth of Kentucky and its administrative office of the courts for refusing to provide her sign language interpreters to enable her to have effective communication during courtroom proceedings.  Defendants in *Mosier* argued that the policy on appointment of interpreters only applies to parties, jurors, and witnesses – not lawyers.  Thus, defendants maintained that discrimination did not result from the handicap alone, but rather from one's status as an attorney (and not a party, juror, or witness).  The court rejected this argument, reasoning:

> [p]laintiff's claim is based on being treated differently than hearing attorneys with regard to access to court services, so [d]efendants' argument is without merit.  It is a question for the trier of fact as to whether [d]efendants discriminated against [p]laintiff based solely on her disability.

*Id.* at 699.  Here, too, Plaintiffs argues that they are not placed on equal footing with hearing spectators of athletic events at Byrd Stadium and the Comcast Center, and fans who view

32

videos of athletic events on the website. The allegations in the second amended complaint are sufficient to infer discrimination solely on the basis of Plaintiffs' disabilities.

### E.   Compensatory Damages

Defendants next argue that Plaintiffs' request for money damages should be dismissed because they fail to allege that Defendants had notice regarding their need for accommodations at University athletic events *and* on University of Maryland's athletic websites. (ECF No. 34-1, at 26). Plaintiffs assert in the opposition, however, that they "abandon any claim for money damages for the University's failure to caption its website." (ECF No. 38, at 29 n.9). Thus, the only issue remaining with respect to Plaintiffs' claim for money damages is whether they have sufficiently alleged that Defendants were on notice of the need to accommodate Plaintiffs with respect to captioning at Byrd Stadium and the Comcast Center.[12]

In general, Plaintiffs are entitled to a "full panoply" of legal remedies under Title II of the ADA or Section 504 of the Rehabilitation Act. *See Pandazides v. Va. Bd. of Educ.*, 13 F.3d

---

[12]   Defendants argue in their motion to dismiss that Plaintiffs fail to allege that they had notice of Dr. Innes's need for accommodations with respect to the University of Maryland's websites. (ECF No. 34-1, at 30). Because Plaintiffs abandon their claim for compensatory damages as to Defendants' alleged failure to provide accommodation in connection with the *athletic websites*, the notice arguments concerning Dr. Innes are now moot.

823, 830 (4th Cir. 1994); *see also Torcasio v. Murray*, 57 F.3d 1340, 1343 (4th Cir. 1995) (recognizing that "remedies available for ADA violations are those available for Rehabilitation Act violations"). The Fourth Circuit has held, however, that compensatory damages require a showing of intentional discrimination or disparate treatment. *See Pandazides*, 13 F.3d at 829-830 & n.9; *Paulone v. City of Frederick*, 787 F.Supp.2d 360, 373-74 (D.Md. 2011). Although the Fourth Circuit has not specifically addressed whether compensatory damages are available for failure to provide reasonable accommodation under the disability statutes, "the majority of circuits that have resolved the question have held that damages may be awarded if a public entity 'intentionally or with deliberate indifference fails to provide meaningful access or reasonable accommodation to disabled persons.'" *Paulone*, 787 F.Supp.2d at 373 (*quoting Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir. 2008), and listing circuit court cases). The undersigned held in *Proctor v. Prince George's Hosp. Ctr.*, 32 F.Supp.2d 820, 829 n.6 (D.Md. 1998), that "the level of proof necessary for finding intentional discrimination under [the] Rehabilitation Act means a deliberate indifference to a strong likelihood that a violation of federal rights would result." *See also Paulone*, 787 F.Supp.2d at 373-75 (adopting deliberate indifference standard as applied in *Proctor*). Defendants intentionally

34

violate the ADA and the Rehabilitation Act by demonstrating deliberate indifference when they have "notice of the potential risk of their decision, and clearly [refuse] the accommodation knowingly." *Proctor*, 32 F.Supp.2d at 829 (*quoting Bartlett v. N.Y. State Bd. of Law Exam'rs*, 970 F.Supp. 1094 (S.D.N.Y. 1997)).   A plaintiff need not show "discriminatory animus" to recover damages under Title II of the ADA or Section 504 of the Rehabilitation Act.   *Paulone*, 787 F.Supp.2d at 373 (*citing Pandazides*, 13 F.3d at 830 n.9).   Rather, as explained in *Proctor*, 32 F.Supp.2d at 828, compensatory damages are available for failure to accommodate a plaintiff if defendants "acted 'knowingly, voluntarily, and deliberately,'" even if the violations resulted from mere "'thoughtfulness and indifference' rather than because of any intent to deny Plaintiff's rights."

Defendants argue that two of the three Plaintiffs - Mr. Markel and Mr. Rinas - fail to allege that Defendants had notice of *their* need for accommodations at University of Maryland's athletic events held at Byrd Stadium and the Comcast Center; thus, Defendants contend that Plaintiffs cannot plead intentional discrimination.   (ECF No. 34-1, at 26).[13]   The second amended complaint states that Dr. Innes contacted the University of Maryland's "Terrapin Club" on multiple occasions - even prior

---

[13] Defendants do not dispute that they had notice of Dr. Innes's request for captioning at Byrd Stadium and the Comcast Center.

to 2007 - to request that Defendants provide captioning for football games and basketball games. (ECF No. 33 ¶ 25). The second amended complaint also avers that on February 8, 2013, before Plaintiffs instituted this action, *Plaintiffs* sent a letter to Defendants "requesting captions for announcements made on public address systems, on the scoreboards, LED ribbon boards, and/or Jumbotron at Byrd Stadium and Comcast Center and for those captions to be visible from all seats in each venue." (*Id.* ¶ 28). Plaintiffs assert that the requests from Dr. Innes and the February 8, 2013 letter put Defendants on notice regarding the need for a reasonable accommodation. Furthermore, Plaintiffs argue that this lawsuit – initially filed in September 2013 – put Defendants on notice of the need to provide captioning at Byrd Stadium and the Comcast Center. (ECF No. 38, at 30). Plaintiffs maintain that Defendants continue to refuse to provide the requested accommodation.

Plaintiffs' request for compensatory damages will not be dismissed at this time. First, the contact from Dr. Innes requesting captioning – even prior to 2007 - was sufficient to put Defendants on notice that other deaf patrons would experience similar difficulties in attending athletic events at Byrd Stadium and the Comcast Center. *See Proctor*, 32 F.Supp.2d at 829 ("It cannot be said that PGHC, which had been subject to a past complaint to the OCR, did not have notice of potential

liability that arises when determining the accommodations appropriate for hearing-impaired patients."); *Jarboe v. Md. Dep't of Public Safety and Correctional Servs.*, Civil Action No. ELH-12-572, 2013 WL 1010357, at *15 (D.Md. Mar. 13, 2013) ("although the extent of plaintiffs' disabilities and requested accommodations may vary to some degree, all of the plaintiffs are profoundly deaf and complain about substantially similar alleged failures to accommodate their disability in common aspects of prison life. In my view, application of the single-filing rule is appropriate in such circumstances.").[14]  As Plaintiffs point out, "[b]ecause Innes's requests for captioning resulted in no remedy, the Defendants cannot credibly claim that if Plaintiffs Markel or Rinas had requested captioning, the Defendants would have complied and captioned all football and

---

[14] The "single-filing rule," better known as "vicarious exhaustion," was originally developed in the context of the administrative exhaustion requirement under Title VII of the Civil Rights Act of 1964 and related employment discrimination statutes. As Judge Hollander explained in *Jarboe*, 2013 WL 1010357, at *11, the "single-filing rule" permits "employees who allege that they have all been subjected to the same discriminatory employment practice to rely, in a class action or other multi-plaintiff suit, on a single employee's filing of a complaint with the EEOC challenging the disputed practice to satisfy the requirement of administrative exhaustion." Although the administrative exhaustion requirement is not applicable here, the rationale behind the "single-filing rule" is still quite obviously instructive, and counsels against dismissal of Mr. Markel's and Mr. Rinas's claims for compensatory damages on notice grounds.

basketball games on the scoreboards, ribbon boards, and Jumbotrons." (ECF No. 38, at 32).

Moreover, "in cases where a public accommodation is on notice that its failure to provide an accommodation may violate the Rehabilitation Act and intentionally opts to provide a lesser accommodation, compensatory damages are available." *Proctor*, 32 F.Supp.2d at 829. As Plaintiffs point out, Defendants were on notice – at least as of February 8, 2013 – that Plaintiffs requested captions on scoreboards, LED ribbon boards, and/or Jumbotron at Byrd Stadium and the Comcast Center. (ECF No. 33 ¶ 28). Instead, during the 2013-2014 football season at Byrd Stadium, Defendants offered captions on hand-held devices. The parties dispute whether the provision of captioning on hand-held devices constitutes a "lesser accommodation." Drawing all inferences in Plaintiffs' favor, however, they have met the showing required in order to pursue compensatory damages.

## IV.  Conclusion

For the foregoing reasons, the motion to dismiss filed by all Defendants will be granted in part and denied in part. President Loh will be dismissed as a party defendant. A separate order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge