**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Southern Division)

| | | |
|---|---|---|
| JOSEPH INNES, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Action No. 8:13-cv-02800-DKC |
| BOARD OF REGENTS, *et al.*, | * | |
| Defendants. | * | |

* * * * * * * * * * * *

**OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO PRECLUDE ANY TESTIMONY OF PLAINTIFFS' EXPERT WITNESS JEFFREY B. PELZ, Ph.D**

Plaintiffs' expert, Dr. Jeffrey Pelz, is undisputedly qualified in the field of imaging science and visual perception and gaze. His testimony will help the Court and jury understand the science behind the need for line-of-sight captioning, including Plaintiffs' descriptions of their difficulty using the hand-held captioning devices provided by Defendants.

## I. BACKGROUND

As relevant to this Motion, this litigation concerns the University of Maryland's failure to provide effective communication at University football and basketball games for individuals who are deaf. Plaintiffs' Second Amended Complaint alleges that despite years of requests by Plaintiffs, Defendants continue to fail to provide captioning that provides effective communication at football games at Byrd Stadium and basketball games at the Comcast Center. Prior to the 2013 football season, it is undisputed that Defendants provided no auxiliary aids and services. Beginning with the 2013 football season, Defendants provided auxiliary aids and

services that Plaintiffs allege do not provide effective communications, as required by the Americans with Disabilities Act and Section 504 of the Rehabilitation Act of 1973.

As part of their case, Plaintiffs retained Dr. Jeffrey Pelz as an expert on eye-tracking. Dr. Pelz, a tenured professor of imaging science at the Rochester Institute of Technology (RIT), is an expert in visual perception and gaze patterns.[1] He is also the Co-Director of the Multidisciplinary Vision Research Laboratory and holds the Frederick Wiedman endowed professorship in the Chester F. Carlson Center for Imaging Science at RIT.[2] Dr. Pelz is on the board of directors of the international Eye Movement Researchers' Association and regularly reviews articles for imaging and visual perception journals including the *Journal of Vision, Vision Research, Visual Cognition, Perception and Psychophysics, Transactions on Applied Perception*, and *Brain Research*. He has published more than 60 refereed journal and conference proceedings and book chapters and has two pending patents and three granted patents.[3] Defendants do not challenge Dr. Pelz's qualifications.

Dr. Pelz's research focuses on two areas: (1) the development of novel instrumentation to monitor the gaze patterns of observers as they perform tasks in natural environments, and (2) the use of those instruments to examine complex tasks. Given his expertise in human visual perception and the study of eye movements, as well as his peer-reviewed work on these topics, Plaintiffs retained Dr. Pelz to report on the adequacy of the University of Maryland's captioning system.[4]

Dr. Pelz will explain to the trier of fact that fans at a sporting event who can hear and see normally guide their attention to different regions of the stadium or playing field by shifting their

[1] Ex. 1, Pelz Dec'l at ¶ 1–2; Ex. 2, Pelz Dep. 52:1-4.
[2] Ex. 1 at ¶ 1.
[3] *Id*. at ¶ 3.
[4] *Id*. at ¶ 7.

gaze. These rapid eye movements are known as *saccade* and are among the fastest movements that humans can make and occur every 1-3 seconds.[5] These rapid shifts are central to how the human visual system works because humans have uneven resolution across the visual field, meaning that the quality of vision falls off even just a few degrees away from the center of the field of vision.[6] The eye must therefore make rapid movements to perceive information.[7]

Although peripheral vision is limited in resolution, it is critical to perception because "when reading, peripheral vision is used to time and plan eye movements; when viewing a video, we monitor the periphery to determine where to move the eyes to get the desired information."[8]

Dr. Pelz will explain that deaf and hard of hearing observers rely even more on their 'near peripheral' vision because they cannot rely on hearing to provide cues to distant targets. For this reason, deaf and hard of hearing viewers of captioned broadcast television use rapid eye movements to perceive both the video and the caption. Dr. Pelz's report explains that "[t]he fact that the captions are visually 'near' the image is important because when reading the caption, a significant motion or even a facial expression by a character could elicit an eye movement between the captions and the video image."[9]

Although Dr. Pelz is undisputedly an expert in the field of imaging science, and visual perception and gaze, Defendants attempt to discredit his conclusions by attacking the validity of the conclusions he drew from his examination of Defendants' "captioning" system and assessment of Defendants' athletics venues. Defendants contend that Dr. Pelz did not conduct a

---

[5] *Id*. at ¶¶ 8 - 11.
[6] *Id.*
[7] *Id.*
[8] *Id*. at ¶ 19.
[9] *Id*. at ¶¶ 19–20

"scientifically valid study," and his conclusions are inadmissible for this reason.[10] Defendants confuse the issues and misapply his work to the evidentiary standards and case law. Dr. Pelz's work and opinions are clearly within the limits of Federal Rule of Evidence 702.

## II. ARGUMENT

### A. Dr. Pelz's opinion regarding the need for line-of-sight captioning satisfies Rule 702 of the Federal Rules of Evidence and should not be excluded.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of Evidence, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

"A district court considering the admissibility of expert testimony exercises a gate keeping function to assess whether the proffered evidence is sufficiently reliable and relevant." *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 260 (4th Cir. 1999). To admit expert testimony, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). Courts engage in a two-part inquiry:

> The first prong of this inquiry necessitates an examination of whether the reasoning or methodology underlying the expert's proffered opinion is reliable—that is, whether it is supported by adequate validation to render it trustworthy. The second prong of the inquiry requires an analysis of whether the opinion is relevant to the facts at issue.

[10] Def.'s Motion in Limine, CM/ECF 62-1 at 5.

*Westberry, supra,* 178 F.3d at 260 (citations omitted); *see also Whitfield v. S. Maryland Hosp. Inc.*, CIV.A. DKC 12-2749, 2014 WL 923255 at *4 (D. Md. Mar. 7, 2014). Because Dr. Pelz's testimony is both reliable and relevant, the Court should deny Defendants' motion to exclude.

Defendants' argument for throwing out Dr. Pelz's opinion and declaration centers on their belief that he should have, but did not, conduct a "scientifically valid study" before reaching any conclusions about the disputed captioning system.[11] The Federal Rules do not require that every expert employed by a party conduct a unique scientifically valid study for each case. Rather, experts must use scientifically valid methods and apply those methods to the situation they seek to analyze. This is precisely what Dr. Pelz did. To the extent that Defendants claim that there is an "analytical gap" between the research and Dr. Pelz's conclusions, they are mistaken. His opinions are both reliable and relevant. Not only is his opinion based on years of study in the field of visual imaging and gaze, including multiple published studies, it is also based on first-hand testing of the captioning system itself. It is therefore undisputedly reliable. Dr. Pelz's opinion is relevant because he will provide an explanation to the trier of fact for why it is that hand-held devices do not provide for effective communication.

In this case, Defendants do not contest that the equipment or methods Dr. Pelz used were not valid methods used by experts in the field of visual perception and gazing.[12] They only argue that because he didn't test enough people or control enough variables to turn his expert declaration into a published article, his declaration is not reliable. But that is not the standard, and his opinion is firmly grounded in both written research and direct observation. Dr. Pelz was retained to explain, from a scientific stand-point, the physical and neurological reasons it is

---

[11] *Id.* at 5.

[12] As Dr. Pelz explains in his deposition, the software he uses has been validated and has acquired general acceptance in the cognitive science community. Ex. 2, Pelz Dep. 55:5 – 21.

difficult for deaf fans to utilize a hand-held device to read captions while watching a live sporting event. Dr. Pelz's declaration on this subject utilizes both background research that he has done throughout his career and a demonstration and model using the actual system in place.[13] The demonstration is but one part of a longer report explaining the neural and cognitive reasons that deaf and hard of hearing fans rely to such a great degree on their "near peripheral" vision.[14] It demonstrates in real-time, using the actual system purchased by Defendants, what published reports have written about for years:[15] that the deaf observers reading captions spent less time observing the live action.[16] Then, it applies this finding to Defendants' system, showing that deaf observers spend even more time reading captions with Defendants' system than they do in other settings. This study simply demonstrates what literature already tells us.

Defendants also object that Dr. Pelz did not control for differences in the quality of the testers' vision. Dr. Pelz testified in his deposition that he ensured that the test subjects could read and observe a board at the other end of the court and that the deaf tester could read the captions.[17] Defendants make several other specious claims – that he does not specifically cite peer-reviewed data on scoreboards and hand-held systems and does not compare the captioning system currently offered with what Plaintiffs desire. These arguments assume that scientists can never use work performed in one setting (for instance, captions on television) and apply it in another setting (for instance, captions in stadiums). If this were the case, scientific reports would

---

[13] Any objections that Defendants may have about the fact that Dr. Pelz performed his study only at a basketball game should be disregarded because Defendants did not grant permission for him to perform his study at a football game.
[14] Ex. 1 at ¶ 19.
[15] *Id.* at ¶ 21.
[16] *Id*. at ¶ 23, p. 10-11.
[17] Ex. 2, Pelz Dep. 61:3 – 63:16.

have very little value as they would only be applicable in exactly-duplicative situations. In his deposition, Dr. Pelz tried to explain as much to Defendants' counsel:

> You're making a leap that in order to address a question, you have to have collected data on that specific topic. And from my perspective, the whole idea of research is to be able to apply research more broadly than that. So, for example, I think that a paper on captioning in broadcast television can be relevant to this question, even though we're not talking about broadcast television.[18]

There is no analytical gap here: Dr. Pelz is using research done and applying it to the question before him. That is the basis of all science.[19] Finally, Defendants criticize the fact that Dr. Pelz did not test Plaintiffs' comprehension of the captioning. Dr. Pelz was not asked to do this and does not opine about it in his declaration. He will not be testifying as to how much Plaintiffs comprehended. Therefore, this is not a basis for excluding his testimony. His opinion and declaration are undisputedly reliable and helpful.

Each of the alleged faults that Defendants have uncovered goes to the weight that the trier of fact will give his findings, not its admissibility. *See Daubert*, 509 U.S. at 596 ("[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. . . . These conventional devices, rather than wholesale exclusion under an uncompromising 'general

---

[18] *Id*., 68:11 – 71:9.

[19] *See Ruark v. BMW of North Am*., LLC, 2014 U.S. Dist. LEXIS 11969 at *29 (D. Md. Jan. 30, 2014) (admitting expert testimony where witness's testimony concerned rollover automobile crashes, but relied on studies that "do not replicate the precise circumstances of a rollover crash"); *Harris v. CSX Transp., Inc.*, 753 S.E.2d 275, 299 (W. Va. 2013) (holding that district court abused its discretion in not admitting testimony of three toxicologists, whose discipline centers around applying studies of animals and of cadaver tissue to the impact of toxin exposure to living humans). In the *Harris* case the court stated that "a full blown evidentiary *Daubert/Wilt* analysis was required only for evaluating a new and/or novel scientific methodology." *Id.* at 305. Similarly, in this case, Dr. Pelz is not using a new or novel scientific methodology.

acceptance' test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702.")

Dr. Pelz's opinion is also relevant. He will explain to the trier of fact that it is not just personal preference by Plaintiffs that make them dislike the hand-held system and seek a line-of-sight system, but that there are neural and cognitive reasons behind that request (that Plaintiffs, or any lay person, would not know of). He will explain why it is that "for a system to be effective, captions should be near what the person is trying to see."[20] This information will help the trier of fact understand why Defendants' system does not result in effective communication and what a system that does result in effective communication should look like.

**B. Dr. Pelz's testimony regarding accuracy and accessibility of the captioning system should be admitted.**

This Court should allow Dr. Pelz to provide his opinion as an expert on those matters that are part of his area of expertise. Dr. Pelz attended both a football game and a basketball game and used the hand-held captioning devices at both games. During the game Dr. Pelz observed that the captioning frame often froze – requiring the deaf tester to look repeatedly at the screen to see when the captions had started again. Because that fact goes to the number of eye movements the deaf tester made, it is part of the foundation of his opinions and is therefore admissible.

Even if Dr. Pelz's personal experience and observations regarding the quality of the captioning he observed were not made in his capacity as an expert, they are still admissible pursuant to Fed. R. Evid. 402 (regarding relevance) and 602 (requiring personal knowledge). Because Dr. Pelz's observations are both from his personal knowledge and are relevant, his factual testimony about what he observed is admissible.

[20] Ex. 2, Pelz Dep. 67:13-17.

Dr. Pelz's lay opinions that rationally flow from his personal observations are also admissible under Federal Rule of Evidence 701. This rule permits lay opinions that are (a) rationally based on the witness's perception; (b) helpful to clearly understand the witness or to determine a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. Under this Rule, Dr. Pelz should be permitted to testify to opinions not based on specialized knowledge. Dr. Pelz attended two games, made notes of what he saw, and can testify regarding the quality and accessibility of the captioning system the Defendants have purchased. Thus, Rule 701 requires the court to admit his testimony about those games. Dr. Pelz can testify that the announcements made over the public address system (1) contained information not reflected in the captioning transcripts; (2) were made long before the captions appeared; and (3) contained different words and phrases than the captioning transcript.

## CONCLUSION

There is no dispute that Dr. Pelz has the qualifications to provide expert testimony on visual imaging, perception, and gaze. Because his testimony is based on years of research and direct observation, and because it will help the trier of fact understand the evidence and testimony regarding eye gaze and captioning, as well as provide an expert opinion as to the requirements for an effective captioning system, his testimony should be permitted.

Respectfully submitted,

/s/

Joseph B. Espo, Fed. Bar No. 07490
Brooke E. Lierman Fed. Bar No. 17879
BROWN, GOLDSTEIN, & LEVY, LLP
120 E. Baltimore St., Suite 1700
Baltimore, Maryland 21202-6701
Tel: (410) 962-1030
Fax: (410) 385-0869
jbe@browngold.com
blierman@browngold.com

Caroline Jackson, Fed. Bar No. 18545
THE NATIONAL ASSOCIATION OF
THE DEAF LAW AND ADVOCACY CENTER
8630 Fenton St., Suite 820
Silver Spring, Maryland 20910
T: (301) 587-1788
F: (301) 587-1791
caroline.jackson@nad.org

*Attorneys for Plaintiffs*

Dated: July 18, 2014

**CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of July, 2014, a copy of the foregoing Opposition to Defendants' Motion in Limine to Preclude Any Testimony by Jeffrey B. Pelz, Ph.D. and proposed Order was delivered through the Court's CM/ECF system to all attorneys of record.

/s/
Joseph B. Espo