IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| JOSEPH INNES, et al. | : |
|  | : |
| v. | : Civil Action No. DKC 13-2800 |
|  | : |
| THE BOARD OF REGENTS OF THE UNIVERSITY SYSTEM OF MARYLAND, et al. | : |
|  | : |

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this disability discrimination case are the following motions: (1) a motion for partial summary judgment filed by Plaintiffs Joseph Innes, Sean Markel, and Danny Rinas (collectively, "Plaintiffs") (ECF No. 58); (2) a motion to seal filed by Plaintiffs (ECF No. 59); (3) two motions to exclude testimony of Heather York and Jeffrey B. Pelz, filed by Defendants Board of Regents of the University System of Maryland ("the Board of Regents") and the University of Maryland College Park ("the University of Maryland") (collectively, "Defendants") (ECF Nos. 61 & 62); (4) a motion for summary judgment filed by Defendants (ECF No. 63); and (5) a motion for leave to file a surreply filed by Plaintiffs (ECF No. 74). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, both motions for

summary judgment will be denied.  Defendants' two motions to exclude will be denied without prejudice to refiling later in this litigation if necessary.  Plaintiffs' motion for leave to file a surreply will be granted.  The motion to seal will be granted.

## I.  Background

The factual allegations are set forth in a prior memorandum opinion and need not be repeated here.  *See Innes v. Board of Regents of University System of Maryland*, 29 F.Supp.3d 566 (D.Md. 2014).  As relevant here, Plaintiffs Dr. Joseph Innes, Sean Markel, and Daniel Rinas are each deaf or hard of hearing. Defendant University of Maryland, College Park, is a public entity and recipient of federal financial assistance.  Defendant Board of Regents of the University System of Maryland is a public entity and the governing body for the University. Plaintiffs have attended sporting events including football and basketball games at the Capital One Field at Byrd Stadium ("Byrd Stadium") and the Comcast Center at the University of Maryland. Plaintiffs also access Defendants' athletics website – UMTerps.com, and within it, TerpsTV.  In essence, Plaintiffs contend that Defendants failed to provide effective communication for deaf or hard of hearing individuals at Byrd Stadium and Comcast Center and on UMTerps.com.  Plaintiffs believe that all aural content at Byrd Stadium, Comcast Center,

and on the website should be captioned in order to provide effective communication under the disability laws, and further assert that captioning can be – but is not – displayed on Jumbotrons, LED ribbon boards, or scoreboards located throughout Defendants' venues.  Plaintiffs further aver that captioning can also be placed on pre-produced and live videos displayed on UMTerps.com.  Additional facts will be presented in the analysis section below.

Plaintiffs filed a complaint against the University of Maryland, the Board of Regents, and President Wallace D. Loh, in his official capacity, on September 24, 2013.  (ECF No. 1). Plaintiffs later submitted a second amended complaint – the operative pleading here - on January 8, 2014.  (ECF No. 33). The second amended complaint asserts two claims: (1) discrimination under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131; and (2) discrimination under the Rehabilitation Act, 29 U.S.C. § 504.  (ECF No. 33, at 8-10). Plaintiffs assert that Defendants have failed to provide auxiliary aids and services to ensure effective communication with individuals who are deaf or hard of hearing concerning aural information: (1) available on Defendants' athletic website; and (2) projected into the stadium bowls and concourse areas at Byrd Stadium and Comcast Center.  (*Id.* at 9-10).

Plaintiffs seek compensatory damages, declaratory judgment, and injunctive relief. (*Id.* at 10-11).

Defendants moved to dismiss the second amended complaint, which was granted in part and denied in part by memorandum opinion and order issued on July 1, 2014. (ECF Nos. 64 & 65). All claims against Defendant Loh were dismissed. Plaintiffs then moved for partial summary judgment (ECF No. 58), Defendants opposed the motion and cross moved for summary judgment (ECF No. 63), and Plaintiffs filed a reply memorandum and opposition to Defendants' motion (ECF No. 69). Defendants filed a reply memorandum in further support of their motion for summary judgment. (ECF No. 72). Defendants also filed two motions to exclude testimony of expert witnesses (ECF Nos. 61 & 62), and both motions have been fully briefed. Subsequently, Plaintiffs moved for leave to file a surreply (ECF No. 74), Defendants opposed the motion (ECF No. 75), and Plaintiffs replied (ECF No. 76). Plaintiffs also filed a motion to seal (ECF No. 59), and Defendants filed a response (ECF No. 73).

## II. Analysis

### A. Defendants' Motions to Exclude

Defendants filed two motions to exclude testimony from two witnesses, whom Plaintiffs have designated as experts: Heather York and Jeffrey P. Pelz. (ECF Nos. 61 & 62). As will be seen, the admissibility of this evidence need not be resolved in order

to adjudicate the pending motions for summary judgment. Moreover, it may well be that Plaintiffs will not seek to rely on these witnesses later in this litigation. Accordingly, both motions will be denied without prejudice to refiling later in the litigation if necessary.

**B.   Cross Motions for Summary Judgment**

**1.   Standard of Review**

Both parties move for summary judgment.[1]   A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.   *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).   Once a properly supported motion for summary judgment is filed, the nonmoving party is required to make a sufficient showing on an essential element of that party's claim as to which that party would have the burden of proof to avoid summary judgment.   *Celotex,* 477 U.S. at 322-23.

Summary judgment is appropriate under Federal Rule of Civil Procedure Rule 56(a) when there is no genuine dispute as to any material fact, and the moving party is plainly entitled to

---

[1] While Defendants request summary judgment on all claims, Plaintiffs request summary judgment as to liability on all claims, as well as injunctive and declaratory relief, and a trial to determine damages. (ECF No. 58-1, at 7).

judgment in its favor as a matter of law. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)); *see also EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005). The mere existence of a "scintilla" of evidence in support of the non-moving party's case is not sufficient to preclude an order granting summary judgment. *See Anderson*, 477 U.S. at 252.

A "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences." *Shin v.*

6

*Shalala,* 166 F.Supp.2d 373, 375 (D.Md. 2001) (citation omitted). Indeed, this court has an affirmative obligation to prevent factually unsupported claims and defenses from going to trial. *See Drewitt v. Pratt,* 999 F.2d 774, 778–79 (4th Cir. 1993) (*quoting Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir. 1987)).

When, as here, the parties have filed cross-motions for summary judgment, the court must consider "each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cor. 2003) (citation omitted). "Both motions must be denied if the court finds that there is a genuine [dispute] of material fact. But if there is no genuine issue and one or the other party is entitled to prevail as a matter of law, the court will render judgment." 10A Wright, Miller & Kane, Federal Practice & Procedure § 2720, at 336–37 (2014).

## 2. Title II of the ADA and Section 504 of the Rehabilitation Act

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be

subjected to discrimination by any such entity."[2]   42 U.S.C. § 12132.   "Discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."   42 U.S.C. § 12112(b)(5)(A); *see also Paulone v. City of Frederick*, 787 F.Supp.2d 360, 372 (D.Md. 2011) (discussing the equivalence of "reasonable accommodations" and "reasonable modifications"). Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from participation in, or be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."   29 U.S.C. § 794(a). "Despite the general congruence of Title II of the ADA and § 504 of the Rehabilitation Act, . . . a plaintiff must show a different 'causative link between discrimination and adverse action' under the two statutes." *Paulone v. City of Frederick*, 787 F.Supp.2d 360, 370 (D.Md. 2011) (*citing Baird ex rel. Baird v. Rose*, 192 F.3d 462, 469 (4th Cir. 1999)).   Under Title II, a plaintiff need only prove discrimination "by reason of"

---

[2] Claims under Title II of the ADA and the Rehabilitation Act can be combined for analytical purposes because the analysis is "substantially the same." *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 n.9 (4th Cir. 1995); *Rogers v. Dep't of Health & Environmental Control*, 174 F.3d 431, 433-34 (4th Cir. 1999) (stating that courts may apply Rehabilitation Act precedent in interpreting the ADA, and vice versa).

disability.   42 U.S.C. § 12132.   A successful Rehabilitation Act claim, however, requires a showing of discrimination "solely by reason of" disability.   29 U.S.C. § 794(a).

A plaintiff seeking recovery for violation of either Title II of the ADA or Section 504 of the Rehabilitation Act must establish that: (1) he has a disability, (2) he is otherwise qualified to receive the benefits of a public service, program, or activity, and (3) he was excluded from participation in or denied the benefits of such service, program, or activity, or otherwise discriminated against, on the basis of his disability. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 498 (4th Cir. 2005).   Only the third element is in dispute.

Pursuant to statutory mandate, the Department of Justice has promulgated regulations interpreting and implementing both Title II of the ADA and Section 504 of the Rehabilitation Act. The regulations under the two statutes must be "consistent" with each other, 42 U.S.C. § 12134(b), and courts may not construe the provisions of the ADA "to apply a lesser standard than the standards applied under [the Rehabilitation Act] or the regulations issued by Federal agencies pursuant" to the Rehabilitation Act.   *Id.* § 12201(a).[3]   The Justice Department's

---

[3] The regulations pursuant to Title II of the ADA are found at 28 C.F.R. part 35, and the regulations under the

interpretive regulations elucidate the requirement of reasonable accommodations.  Under 28 C.F.R. § 35.130(b)(7), a public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  With regard to communication-related disabilities, the regulations require public entities to "take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others," *id.* § 35.160(a), and to "furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity." *Id.* § 35.160(b)(1).

"Auxiliary aids or services" are defined by both statute and regulation.  *See* 42 U.S.C. § 12103(1); 28 C.F.R. § 35.104. The regulation is more expansive.  Examples of auxiliary aids and services include: "open and closed captioning, including real-time captioning," the "[a]cquisition or modification of

Rehabilitation Act for recipients of federal funding are contained at 28 C.F.R. part 42, subpart G.

equipment or devices," and "[o]ther similar services and actions."   28 C.F.R. § 35.104.   The regulation governing effective communication acknowledges that:

> The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place.

28 C.F.R. § 35.160(b)(2).   Notably, the regulation further instructs:

> In determining what types of auxiliary aids and services are necessary, *a public entity shall give primary consideration to the requests of individuals with disabilities*.

*Id.* (emphasis added).

Similarly, the regulations interpreting the Rehabilitation Act require recipients of federal funding to "insure that communications with their applicants, employees and beneficiaries are effectively conveyed to those having impaired vision and hearing." *Id.* § 42.503(e).   Moreover, a "recipient that employs fifteen or more persons shall provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude participation of such persons in a program or activities receiving Federal financial assistance." *Id.* § 42.503(f).

11

### a.   Byrd Stadium and Comcast Center

In February 2013, when the National Association of the Deaf ("NAD") wrote to the University of Maryland on behalf of Plaintiffs, there were no devices for the deaf or hard of hearing to access aural content at Byrd Stadium and Comcast Center. (*See* ECF No. 63-13, February 8, 2013 letter to the University of Maryland). At some point, Defendants provided captioning of aural content on hand-held devices, but the record shows that the use of hand-held devices was intended to be a temporary measure while Defendants began making plans to install equipment for captioning on ribbon boards. (*See* ECF No. 63-12, at 38). While this case was progressing, on June 24, 2014, the University issued a purchase order for the acquisition of LED ribbon boards and associated equipment from Daktronics, Inc. (*See* ECF No. 72-1; *see also* ECF No. 72, at 9). As a result, it is not at all clear: (1) whether Defendants now have implemented services deemed adequate by Plaintiffs, and, if so, (2) whether they could or should have done so sooner. As will be seen, the parties dispute when the University first received notice as to the need to accommodate deaf or hard of hearing patrons at Byrd Stadium and Comcast Center. Moreover, regardless of when Defendants first received notice, there is a genuine dispute as to whether the provision of "line of sight" captioning would have constituted a fundamental alteration or undue burden.

12

The complaint contends that Defendants are liable for violations of Title II of the ADA and Section 504 of the Rehabilitation Act because they do not provide captioning at Byrd Stadium and Comcast Center via scoreboards, ribbon boards and/or Jumbotrons, instead opting to provide captioning on hand-held devices, which Plaintiffs maintain do not effectively communicate aural content. The record evidence indeed establishes that the temporary hand held devices did not provide effective communication, and in fact were recognized as such, being merely a temporary accommodation. Dr. Innes and Sean Markel gave deposition testimony concerning the inadequacies of hand-held devices. (*See* ECF No. 58-11, at 8-9; *see also* ECF No. 58-6, at 25-31); *see Feldman v. Pro Football, Inc.*, 579 F.Supp.2d 697, 709 (D.Md. 2008) ("Plaintiffs have represented, and Defendants do not disagree, that assistive listening devices are useless to these Plaintiffs. Thus, these devices cannot possibly ensure effective communication with Plaintiffs."). Kevin Anderson, the University Athletic Director, and Joshua Kaplan, the assistant athletics director for facilities, operations, and events at the University of Maryland, testified that hand-held devices were a temporary solution offered to Plaintiffs because the requested accommodation of captioning on scoreboards, LED ribbon boards, and/or on Jumbotrons could not be implemented in the time frames acceptable to Plaintiffs.

(*See* ECF No. 63-12, at 20, Kaplan depo.) ("We said let's provide them something while the ultimate goal is, what we said we would do at the time when we made an offer was we would provide ribbon boards for the future"); (*see also* ECF No. 63-11, at 12, Anderson depo.).

Defendants' legal position is that installing the ribbon boards will constitute a fundamental alteration and undue burden, but they may be moving in that direction anyway. Specifically, in their reply memorandum in support of their motion for leave to file a surreply (discussed below), Plaintiffs indicate that as of August 2014, "Defendants announced that they had made numerous upgrades to the electronic components in Byrd Stadium and the Xfinity Center, including new LED display upgrades, additional message displays at Byrd Stadiums, a new video control room, a new center-hung videoboard at XFinity Center, and four message displays at XFinity Center." (ECF No. 76, at 3). Plaintiffs attach as an exhibit a press release, dated August 28, 2014, reflecting an announcement from the University of Maryland Athletics Department regarding new LED display upgrades, ribbon displays, and message displays featuring closed captioning. (*See* ECF No. 76-1, at 2). Moreover, during his deposition taken in April 2014, Joshua Kaplan, the assistant athletics director for facilities, operations, and events at the University of Maryland, confirmed

that the University of Maryland was in the process of transitioning to ribbon board use at Byrd Stadium and Comcast Center. (*See* ECF No. 63-12, at 20-21). He stated that the Athletic Department planned to purchase four new ribbon boards and two additional ribbon boards for Byrd Stadium. (ECF No. 63-12, at 38). Mr. Anderson similarly represented that he approved the purchase of ribbon boards at Byrd Stadium and Comcast Center "regardless of cost." (ECF No. 63-11, at 12). Neither party has advised the court, however, regarding whether any of these advertised changes have been implemented or whether aural content at Byrd Stadium and Comcast Center already is being captioned. Nor have Plaintiffs advised whether the advertised changes concerning the installation of ribbon boards are deemed adequate under Title II of the ADA and Section 504 of the Rehabilitation Act.

Moreover, Plaintiffs take the position that the University of Maryland violated the disability laws because it should have implemented "line of sight" captioning *immediately* after Plaintiffs made the request. As the following discussion will reveal, there is a genuine dispute of material fact as to when Defendants first received notice regarding the need to accommodate deaf patrons and if, whenever they received notice, providing "line of sight" captioning would have constituted a fundamental alteration or an undue burden.

### i. Notice to Defendants

Plaintiffs argue that Defendants were put on notice many times by Dr. Innes (and his friend Sandy Ewan) that aural content at Byrd Stadium and Comcast Center should be captioned on scoreboards, ribbon boards, or Jumbotrons, but this point is disputed. Dr. Innes testified that over the course of five to seven years, Mr. Ewan and he attended at least four meetings with representatives from the University athletic center, the first of which occurred during the design of Comcast Center. (*See* ECF No. 58-6, at 5-6). Defendants counter that the University of Maryland has no record of any written requests for accommodation prior to February 8, 2013, when it received a letter from the NAD on behalf of Plaintiffs, and that "[t]he sole documentation in the University's files pertaining to requests by any of the Plaintiffs identifies Dr. Innes and it merely states that he requested seats with an unobstructed view." (ECF No. 63-1, at 28; *see also* ECF No. 63-17). According to Defendants, the only written request to "caption the announcements made on the public address systems on the scoreboards, LED ribbon boards, and/or Jumbotrons at Byrd Stadium and Comcast Center" – made in February 2013 through NAD – received prompt and serious consideration. (ECF No. 58-19, at 3). By letter dated March 29, 2013, the University responded: "The University has taken into consideration your request,

investigated this issue, reviewed our current technology, and assessed the options available for captioning.  We believe the best option to provide accessibility to our deaf and hard of hearing patrons is 'speech to text' software, available through YouCaption, partnering with Apple."  (ECF No. 58-20, at 2). Based on the foregoing, there is a genuine dispute as to when Defendants first received notice regarding the need to caption aural content at Byrd Stadium and Comcast Center.

### ii. Fundamental Alteration and Undue Burden

Irrespective of when Defendants first received notice of the request to caption aural content at Byrd Stadium and Comcast Center, they assert that "line of sight" captioning would result in a fundamental alteration and an undue burden.

Notwithstanding any other requirements in the regulations, a public entity need not, under Title II "take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity, or in undue financial and administrative burdens."  28 C.F.R. § 35.164; *see also K.M. ex rel. Bright v. Tustin Unified School Dist.*, 725 F.3d 1088, 1097 (9th Cir. 2013) ("Title II and its implementing regulations, taken together, require public entities to take steps towards making existing services not just accessible, but *equally* accessible to people with communication disabilities, but only insofar as doing so does not pose an undue burden or

require a fundamental alteration of their programs.") (emphasis in original).   The public entity has the burden to prove that a proposed action would result in "undue burden" or "fundamental alteration."   Section 35.164 requires that:

> In those circumstances where personnel of the public entity believe that the proposed action would fundamentally alter the service, program, or activity or would result in undue financial and administrative burdens, a public entity has the burden of proving that compliance with this subpart would result in such alteration or burdens. The decision that compliance would result in such alteration or burdens must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion.

*Id.* (emphasis added).[4]

_____

[4] Plaintiffs contend that Defendants may not raise the fundamental alteration and undue burden affirmative defenses because "neither President Loh, the Board of Regents, nor any other designee of Defendants has indicated that s/he has made the decision that line-of-sight captioning would result in a fundamental alteration or undue burden, and no 'written statement of reasons' was ever sent to Plaintiffs." (ECF No. 69, at 17).   As Defendants argue, however, "the University did not categorically reject [] Plaintiffs' request for accommodation" at Byrd Stadium and Comcast; "the University concluded that [] Plaintiffs' preferred method of accommodation, namely captioning on Jumbotrons, LED ribbon boards and/or scoreboards presented technical and financial obstacles that made *immediate* implementation infeasible." (ECF No. 72, at 12-13) (emphasis added); *see, e.g.*, *Werner v. Colorado State University*, 135 F.Supp.2d 1137, 1141 (D.Colo. 2000) ("Even assuming that 28 U.S.C. § 35.150(a)(3) is the only basis on which CSU could assert [the undue burden] defense, the

Defendants contend that providing "line of sight" captioning would have altered fundamentally the athletic events offered at Byrd Stadium and Comcast Center due to the administrative and financial burdens captioning would entail. "A modification to 'an essential aspect' of the program constitutes a 'fundamental alteration' and, therefore, is an unreasonable accommodation." *Halpern v. Wake Forest Univ. Health Sciences*, 669 F.3d 454, 464 (4th Cir. 2012) (*citing PGA Tour, Inc. v. Martin*, 532 U.S. 661, 682-83 (2001)). Defendants' arguments to show fundamental alteration are misplaced. They state that "[t]he modifications sought by Plaintiffs would *fundamentally alter the University's athletic department equipment and operations* in ways that are exceptionally burdensome, complex[,] and costly." (ECF No. 63-1, at 20) (emphasis added). The proper inquiry, however, is whether "the proposed action would fundamentally alter the service, program, or activity." 28 C.F.R. § 35.164. According to Defendants, Plaintiffs ask "fundamentally [to] alter . . . how the Athletic Department supplies information to those attending the game." (ECF No. 72, at 10). The programs or services provided at Byrd

---

regulation's procedural requirements, by their terms, only apply to instances in which a public entity refused to take a proposed action based on the alterations or burdens that would result. In this case, the evidence [] indicates that CSU did not refuse to take any particular action, but rather continued to work on various means to accommodate Werner's needs.").

19

Stadium and Comcast Center are the football and basketball games; Defendants have not established how offering captioning on ribbon boards, scoreboards, or on Jumbotrons – the accommodation requested here – would alter such programs or services. As Plaintiffs argue, providing captioning in the form requested by them would not change how either the football or basketball programs are conducted, but merely provide access to the audio component of the program.

Defendants also raise the undue burden affirmative defense. Plaintiffs allegedly demanded captioning by September 2013, the beginning of the 2013-2014 football season. (ECF No. 72, at 12). Defendants explain:

> After receiving [] Plaintiffs' February 8, 2013 demand, the University investigated the options for providing captioning at Byrd Stadium and Comcast Center. *The University's investigation revealed that several factors made [] Plaintiffs' preferred remedy, captioning on the existing video displays, infeasible.*
>
> First, there are enormous technical obstacles to getting a reliable signal to a video display. Byrd Stadium and Comcast Center share a single, aging control room that is beyond its useful life. [] This has made it highly unreliable and placing additional demands on the system threatens more frequent interruptions in service. [] Parts for repairs are extremely hard to find. The control room's current closed captioning encoder and its phone line for external operation by closed captioning companies are unreliable and need replacement. [] Also, the fiber connection

>         system used currently would require the
>         installation of additional systems to
>         support a dedicated closed caption video
>         board feed to Byrd Stadium.
>
>         Second, the present video displays are
>         not adequate for displaying captioning. []
>         The relatively small size of the present
>         video boards, and the amount of physical
>         space captioning would require makes their
>         use impractical. []  Captioning would black
>         out a full one-third of the present screen.
>         []  This would cut off the space presently
>         used for live-action video and result in
>         fans missing much of the action on the
>         video. []  It would also adversely impact
>         video space currently used for vital
>         advertising that helps to defray the cost of
>         athletic department operations.

(ECF No. 63-1, at 20-21 (emphasis added); *see also* ECF Nos. 63-10, at 22-25 & 63-12, at 12).

Furthermore, according to Mr. Kaplan, installing ribbon boards in a single stadium would cost between $400,000 and $700,000, and "[t]his [figure] does not include ancillary requirements such as providing power, providing a working signal (i.e., installing fiber cable), or providing all the necessary modern equipment to run it." (ECF No. 63-1, at 21; ECF No. 63-12, at 5). Mr. Kaplan testified that the budgetary estimate for installing ribbon boards in both stadiums and replacing all the video equipment to run the boards was approximately $3.75 million, $1.5 million of which represented the cost of updating the videos. (ECF No. 63-12, at 21). Defendants contend that the cost must be balanced "against the financial realities of

the University's athletic department," and not the as a whole. (ECF No. 63-1, at 22).   According to Mr. Anderson, the University was operating under a deficit, which made immediate implementation infeasible:

> Q: What's the money issue?
>
> A: Well, right now the ACC [Atlantic Coast Conference] has withheld $22 million of ours and that we're looking at it will probably be 30 million and we're in, we're in litigation now with them and *so that plus inheriting a structural deficit that was going on for five years before I came here plus we have debt on new buildings that happened before I was here that there's a lot of things that we need to take care of*, and so it's just a matter of balance, and this is a priority and, you know, we're moving forward where, you referenced it before, it's not a budgeted item but we have to find it somewhere, so we're probably robbing Peter to pay Paul but we know that this is important, that we have to do it.
>
> Q: Thank you.  And for the timing, what is the timing issue, could you explain that?
>
> A: Well, it's just going through the procurement.  You know, I mean if, if we could have signed a contract yesterday and just gone through and not have to go through any of the . . . policies and procedures that we're all held to, I would have done it yesterday.

(ECF No. 63-11, at 24) (emphasis added).

Plaintiffs, on the other hand, reference testimony from Mr. Kaplan that although the video equipment would need to be replaced to allow for captioning on ribbon boards, the video

equipment would serve *other purposes* in addition to captioning. (ECF No. 63-12, at 38).  Plaintiffs also believe that Defendants overstate the extent of the University's financial hardship, referencing anticipated *future* revenue increases stated in the Fiscal Year 2014 budget overview for the University of Maryland. (*See* ECF No. 69-3).  The Fiscal Year 2014 budget overview states:

> In November 2012, the financial picture looked a lot brighter when UMCP accepted an invitation to join the Big Ten on July 1, 2014.  This will significantly enhance future revenues by $100 million in the first six years according to *Sports Illustrated*.

(*Id.* at 35).  The fact that the budget for the athletic department or the University of Maryland as a whole may be increasing in the future, however, does not establish that replacing all of the video equipment to install ribbon boards at Byrd Stadium and Comcast Center would not have constituted an undue burden when Plaintiffs first requested this accommodation. Indeed, the budget overview further states that the ACC "instituted a $52 million exit fee." (*Id.*).  Moreover, the fact that Defendants have now contracted for ribbon board installation from Daktronics, Inc. and purportedly spent approximately $3.75 million on this endeavor does not establish that this could or should have been done earlier.  The fact that the University of Maryland may *now* have "considerable resources

to draw from to fund the implementation of a proper captioning system," (ECF No. 69, at 20-21), does not establish as a matter of law that those same resources were available earlier and in the time frames demanded by Plaintiffs, and that the interim measure of providing captioning on hand-held devices violated disability laws.

Based on the foregoing, there is a genuine dispute of material fact as to whether providing "line of sight captioning," regardless of when Defendants first received notice, would have constituted an undue burden and whether Defendants violated Title II of the ADA and Section 504 of the Rehabilitation Act by not implementing Plaintiffs' requested accommodation when the request was made.

### b. UMTerps.com

Plaintiffs argue that Defendants violate Title II of the ADA and Section 504 of the Rehabilitation Act by failing to provide effective communication on the University's athletic website, UMTerps.com. (ECF No. 58-1, at 30). Plaintiffs contend that "[a]s with the athletic events, the University is required to makes its web programming accessible to individuals who are deaf." (*Id.*). "Because UMTerps.com is a service, program, or activity of a public entity, it must be made accessible to deaf users." (*Id.* at 31).

24

Defendants do not dispute that deaf individuals cannot access aural content on UMTerps.com, but contend that the ADA does not require captioning of Internet content. (ECF No. 63-1, at 32). The court need not decide that question, however, because Defendants do *not* argue that the Rehabilitation Act is inapplicable to the website. Section 504 states that "[n]o otherwise qualified individual with a disability in the United States [] shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination *under any program or activity* receiving Federal financial assistance." 29 U.S.C. § 794(a) (emphasis added). "Program or activity" is defined as *all* of the operations of "a college, university, or other postsecondary institution, or a public system of higher education." *Id.* § 794(b)(2)(A). Defendants do not dispute that the aural content streamed on UMTerps.com is one of their programs or activities.

Defendants argue that "[t]he modifications sought by Plaintiffs with respect to the athletic department web site would fundamentally alter the University's athletic department equipment and operations in ways that are exceptionally burdensome, complex and costly." (ECF No. 63-1, at 34). Defendants state that UMTerps.com is unlike other commercial websites because much of the content is produced by student volunteers from the Journalism Department at the University of

Maryland and the website "has been consciously used as a teaching tool." (*Id.* at 34-35). Defendants also believe that captioning of pre-produced events would substantially alter the University's program by impeding the ability to produce timely content; "[t]he captioning of pre-produced material has to be done by a vendor and sending the material out necessarily introduces delay that makes the production of timely video less feasible. [] This will mean the loss of some student opportunities to produce video simply because the window for completion is insufficient." (*Id.* at 36).

Mr. Kaplan explained that UMTerps.com displays pre-produced and live videos. He explained that a company called NeuLion maintains the website. Mr. Anderson stated: "NeuLion maintains our website and *so we give them the information* and they do the design and upkeep." (ECF No. 63-11, at 11) (emphasis added). Mr. Kaplan explained that the University of Maryland would have to provide the captioned content and NeuLion would display it. Mr. Kaplan also stated during his deposition that captioning pre-produced events may change the University's "thought process" because the University likely will need to contract with a vendor to provide captioning on the website and it may take more time to post captioned content of pre-produced events. (ECF No. 63-12, at 33).

The evidence shows that the University will need to determine whether the current equipment is compatible with captioning content for pre-produced and live events and the specific functionalities that any prospective vendor must have. Testimony also suggests that captioning content may add some delay to the process of posting pre-produced videos on UMTerps.com. (*See* ECF No. 63-23, at 21). Defendants have failed to show that captioning aural content on UMTerps.com would fundamentally alter the nature or mix of the service, however (*i.e.,* display of pre-produced or live video content). *See, e.g., Ball v. AMC Entertainment, Inc.,* 246 F.Supp.2d 17, 25 (D.D.C. 2003) ("Given that the closed captions for RWC-compatible films can be provided to deaf individuals during normal screening of those films, installation of RWC can be required under the ADA because it would not change the nature of the service supplied by Defendants – screening first run movies to the public."). That the University will have to "think through" the process for displaying pre-produced and live videos on TerpsTV in order to make the aural content accessible to the deaf community does not establish that the program or service would be fundamentally altered.

That does not end the inquiry, however. Whether the modification would be an undue burden must be addressed. Defendants represent that "the website operates on a

shoestring." (ECF No. 63-1, at 35). Neither Mr. Anderson nor Mr. Kaplan could identify specific costs associated with captioning pre-produced or live events to post on TerpsTV. (*See* ECF No. 63-12, at 38 ("Q: And just to clarify, you don't have any estimate available yet on how much it will cost to provide captioning on umterps.com, correct? A: I do not.")). Mr. Kaplan stated that current equipment may need to replaced:

> A: So the equipment is antiquated. *Would it have to all be replaced or could just a couple of pieces be replaced? I'll be honest, I don't know. I don't know.* The cameras would have to be replaced because the cameras on the digital platform would not give a digital feed, or you could down-convert it, so how that would look, is it going to meet our desire? We don't want to give a half attempt at it, we want to go in full board and make sure it's going to look clear for all our constituents, so you have to basically find out what equipment needs to be purchased and who's going to purchase it, is it us or is the School of Journalism, and if it's us is the School of Journalism going to allow us to use their equipment in conjunction with our basically newly purchased equipment if it happens to be integrated. In conjunction with that[,] there's still the whole Big Ten piece. We don't have a definitive answer on what games we are going to be broadcasting on umterps. So like I said, *when we're going to put it out to bid we want it to be specific.*

(ECF No. 63-12, at 34) (emphases added). Gabriel Unterman, the director of multimedia production at the University of Maryland, explained that as for live events, the key piece of the equipment currently used, the NewTek Tricaster, likely is

incompatible with equipment that would be needed to enable captioning:

> Q: Do you know what, if any, administrative capacity on the university side would be required to caption website videos? []
>
> A: So currently the way that the system being used to stream live content on TerpsTV, as I mentioned before . . . the athletic department uses a system called a tricaster made by this company called NewTek and it was purchased maybe three years ago, and that, [] in order to caption using that piece of equipment, it's very -- *it's almost impossible because that piece, when [] that piece of equipment was purchased it didn't – captioning really wasn't an option for live streaming at that time, so anything now that's available, if it's software or equipment, cannot interact with that piece of equipment. So you would have to buy a whole new system to possibly interact with any captioning software that's out there.* So now once you have the software is one thing, now you need a computer to house the software, then you have the computer and now you need an encoder or a data link associated with it to then tie into the [] device[.] . . . *There's a piece of equipment that kind of can do it but it's not that great, but it's very cost* -- and we're not talking about a ten-dollar piece of equipment. In our world in video, you know, things, if it's a thousand dollars, it's cheap, you know. So it's [] a process that really just hasn't been established yet and it hasn't been tested, so . . . *it's very expensive to even try it.*

(ECF No. 63-23, at 19) (emphases added).

Plaintiffs emphasize that Defendants have not provided a dollar figure associated with transitioning to captioning pre-

produced and live events and argue that Defendants ignore "the substantial revenue that the University draws by virtue of having the website." (ECF No. 69, at 34). The analysis in *Ball*, 246 F.Supp.2d at 26, applies here. In *Ball*, defendants argued that installation of RWC for all the movie screens in the DC area would be unduly burdensome given their "enormous annual losses." Plaintiffs in *Ball* provided a cost estimate different from that offered by defendants and further argued that defendants' "costs would be offset by tax benefits and increased revenues from ticket sales to deaf patrons and their families and friends." *Id.* Plaintiffs further argued in that case that "[d]efendants' financial resources are more than adequate to cover RWC installation costs given AMC's recent purchase of two movie chains for more than $167 million and Loews' recent purchase of a movie chain for $440 million." Judge Kessler held that based on this evidence, "[t]here are clearly material facts in genuine dispute as to the undue burden claim, and therefore, summary judgment is not appropriate on this issue." The same conclusion is warranted here. There is a genuine dispute of material fact as to whether captioning live and pre-produced content on UMTerps.com would be unduly burdensome. Accordingly, both motions for summary judgment will be denied as to the failure to accommodate claims pertaining to UMTerps.com.

### c. Compensatory Damages, Declaratory & Injunctive Relief

Plaintiffs stated in their opposition to Defendants' motion to dismiss that they "abandon any claim for money damages for the University's failure to caption its website." (ECF No. 38, at 29 n.9); (*see also* ECF No. 69, at 38 n.100 ("Because Plaintiffs have previously clarified that they are not seeking [money] damages [concerning the website], this argument is moot.)). Accordingly, Plaintiffs seek compensatory damages only as to their failure to accommodate claim concerning Byrd Stadium and Comcast Center. With the denial of summary judgment, however, it is premature to address questions of damages or other remedies.

### C.   Surreply

Plaintiffs moved for leave to file a surreply and included a proposed surreply. (ECF No. 74). Local Rule 105.2.a states: "[u]nless otherwise ordered by the Court, surreply memoranda are not permitted to be filed." The court may permit a surreply when a party would not otherwise have an opportunity to respond to arguments raised for the first time in the opposing party's reply. *See Khoury v. Meserve*, 268 F.Supp.2d 600, 605 (D.Md. 2003).

Plaintiffs wish to file a surreply limited to "responding to Defendants' newly produced piece of evidence, attached as Exhibit 22 to Defendants' reply." (ECF No. 74, at 1). Exhibit

31

22, filed with Defendants' reply memorandum, is the purchase order, dated June 24, 2014, showing that the University of Maryland purchased "center and auxiliary boards hung in Comcast and Byrd Stadium." (ECF No. 72-1). The order amount is for $3.75 million.

Mr. Kaplan provided deposition testimony estimating the cost of ribbon board installation. After Plaintiffs challenged the admissibility of this deposition testimony, Defendants attached the purchase order from Daktronics, Inc. evidencing the purported cost of ribbon board installation. Considering the rapidly evolving factual developments in this case and the fact that Plaintiffs did not have an opportunity to address this new document submitted by Defendants, the motion for leave to file a surreply will be granted.

### D.   Motion to Seal

Plaintiffs filed one exhibit under seal, (Exhibit 24; ECF No. 60-1), and redacted a brief portion of their memorandum in support of partial summary judgment which references this exhibit, (see ECF No. 58-1, at 21).[5] Although Plaintiffs' motion is labeled as a motion to seal, they represent that Defendants designated Exhibit 24 as confidential during discovery, and Plaintiffs wish to *unseal* exhibit 24 and publish on the record

---

[5] Plaintiffs filed on the record a redacted version of the memorandum in support of summary judgment (ECF No. 58-1), and filed Exhibit 24 under seal (ECF No. 60-1).

an *unredacted* memorandum.  (*See* ECF No. 59).  Defendants filed a response to Plaintiffs' motion, requesting that Exhibit 24 remain under seal.  Defendants explain that Exhibit 24 is a contract between NeuLion and the University of Maryland for services related to the University's Athletics Department website.  Defendants contend:

> Among other provisions, many sections of the contract document list confidential financial guarantees made by Neulion to the University and vice versa.  This information is not known to outsiders, is held confidential by both parties to the contract, and is valuable to the business of NeuLion and the future bargaining capabilities of the University. Accordingly, the contract is a trade secret, Md. Code Ann., Com. Law § 11-1201 *et seq.*, and should be protected from disclosure. Given the frequency in which confidential information appears in the contract, alternatives to sealing will be insufficient to protect the parties to the agreement and the interests of both parties to the contract will be irreparably harmed.

(ECF No. 73, at 2); *see, e.g., Pittson Co. v. United States*, 368 F.3d 385, 406 (4th Cir. 2004) (affirming decision to seal certain "confidential, proprietary, commercial, or financial data" that was produced under a protective order)

The portions of Plaintiffs' memorandum in support of summary judgment that have been redacted refer to sensitive business information contained in Exhibit 24.  Moreover, the court has not relied on Exhibit 24 in adjudicating the motions

for summary judgment and this memorandum opinion does not reference any purportedly confidential information from this exhibit. Accordingly, the motion to seal will be granted.

## III. Conclusion

For the foregoing reasons, Plaintiffs' motion for partial summary judgment will be denied. Defendants' motion for summary judgment will be denied. Defendants' two motions to exclude expert testimony will be denied without prejudice to refiling at a later point in this litigation if necessary. Plaintiffs' motion for leave to file a surreply will be granted. The motion to seal will be granted. A separate order will follow.


                              /s/
                         _____
                         DEBORAH K. CHASANOW
                         United States District Judge